## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RED FORT CAPITAL, INC.,

         Plaintiff,

    v.

GUARDHOUSE PRODUCTIONS LLC,
GUARDHOUSE STUDIOS ITALY S.R.L.,
GUARDHOUSE STUDIOS
MANAGEMENT LIMITED,
GUARDHOUSE STUDIOS SCOTLAND
LTD., SURYA G. IACONO, RUSSELL S.
DILLEY, L'OPERATEUR PARTENAIRE
SOCIAL, and GM GROUP INTL CORP.

         Defendants.

Case No. _____

## COMPLAINT

Plaintiff Red Fort Capital, Inc. ("Red Fort" or "Plaintiff"), for its Complaint against Defendants Guardhouse Productions LLC, Guardhouse Studios Italy S.R.L., Guardhouse Studios Management Limited, Guardhouse Studios Scotland Ltd., Surya G. Iacono, Russell S. Dilley, L'Operateur Partenaire Social, and GM Group Intl Corp. (collectively, "Defendants"), alleges by its undersigned attorney as follows:

### NATURE OF THE CLAIMS

1.    This case is about the fraudulent procurement of a loan through false statements and forgeries by a conspiracy of companies (the "Guardhouse Companies") and their co-owners Surya G. Iacono and Dr. Russell Dilley (collectively, the "Guardhouse Defendants"). That loan has now gone into default.

2.    In retrospect, it looks like the lender — Plaintiff Red Fort — was a bit credulous. The Guardhouse Defendants came to Red Fort with an elaborate story. They said they were a

group of movie production companies with a grandiose plan to build movie complexes in Scotland and Italy.  The Guardhouse Companies did not have substantial finances, but the Guardhouse Defendants said they were on the verge of a supposed $400 million bond offering to be underwritten in Dubai.  They just needed a bridge loan to get there.

3.     The Guardhouse Defendants said they had an invoice from a French company, L'Operateur Partenaire Social ("L'Operateur"), for €2,371,823, for work they supposedly had done making a corporate video, and they wanted to factor the invoice or borrow against it.  (The invoice was actually billed "on behalf of" L'Operateur to GM Group Intl Corp. ("GM Group"), which functions as L'Operateur's alter ego in the U.S.)  But L'Operateur did not seem to have substantial revenue to pay for such a video.  And it was not clear how the Guardhouse Companies had paid for the supposed production expenses that went into it; they claimed Ms. Iacono (Guardhouse's CEO) and Dr. Dilley (Guardhouse's principal funder) had paid personally.

4.     But Red Fort was not completely naive.  It required various guarantees, including personal guarantees from Ms. Iacono and Dr. Dilley.

5.     In connection with and as partial security for his guarantee obligations, Dr. Dilley provided Red Fort with a personal check in the amount of $2,732,340, post-dated to January 15, 2019 (the loan maturity date).

6.     In connection with Ms. Iacono's guarantee obligations, the Guardhouse Defendants repeatedly said that Ms. Iacono owned a €5.6 million property in Rome across from the Coliseum and provided a document from the Italian property registry purporting to evidence that ownership. Red Fort negotiated to take a mortgage interest in that property in the event of default.  It turns out, Ms. Iacono does not own the property and the document provided by the Guardhouse Defendants

was a *forgery*.  Ms. Iacono's net worth statement, purportedly prepared by Dr. Dilley's personal accountant, also appers to have been *forged* by the Guardhouse Defendants.

7.      Based on the Guardhouse Defendants' various misrepresentations, Red Fort was induced to enter an October 10, 2018 Loan Agreement.  Pursuant to that contract, the Guardhouse Companies received an initial disbursement of €1,750,000 (plus an initial €500,000 to pay Red Fort's various fees and expenses as of that time).  The loan is past due but the Guardhouse Companies have not repaid a dime.  And Red Fort's various options for recourse under the Loan Agreement have come to naught — neither L'Operateur nor GM Group has paid the L'Operateur Invoice (in breach of a specific agreement with Red Fort to do so), Dr. Dilley has stopped payment on his post-dated check, and Red Fort cannot take a mortgage on Ms. Iacono's purported Rome property *because she does not actually own it*.

8.      To make matters worse, the Guardhouse Companies brought a baseless lawsuit in New York state court (the "Guardhouse Lawsuit") challenging the Loan Ageement as purportedly invalid (and not offering to return the money they received) and asking for extraordinary temporary and injunctive relief that was a transparent attempt to prevent Red Fort from investigating and uncovering the Guardhouse Defendants' fraudulent activities (they essentially asked the state court to enjoin Red Fort from contacting supposed Guardhouse clients and "business associates" and from placing a mortgage on the Rome property that the Guardhouse Companies had fraudulently said Ms. Iacono owned).  The state court rejected the Guardhouse Companies' fatuous TRO application but Red Fort incurred significant attorneys' fees in preparing a response to this junk litigation before the Guardhouse Companies got around to voluntarily withdrawing that meritless suit.  The Loan Agreement expressly provides (in section 9.4) that the Guardhouse Companies are required to reimburse Red Fort for, among other things, any out-of-pocket costs and expenses,

including attorneys' fees, that Red Fort incurs in connection with any litigation relating to the enforcement or defense of Red Fort's rights under the Loan Agreement and guarantees, *i.e.*, not only the Guardhouse Companies' withdrawn mertitless suit, but also this litigation.

9.      As of today's date, the amounts the Guardhouse Defendants owe under the Loan Agreement (including Red Fort's attorneys' fees, as expressly provided in the Loan Agreement) come to close to $4 million.  But given the Guardhouse Defendants' wanton and criminal fraud and forgery, they are liable for many millions of dollars more than that, including statutory ***treble*** damages under the federal civil RICO statute and Indiana state law.

## PARTIES

10.      Plaintiff Red Fort is a Puerto Rico corporation with its principal place of business in Puerto Rico.

11.      Defendant Guardhouse Productions LLC ("Guardhouse Nevada") is a Nevada limited liability company with its principal place of business in Nevada.  On information and belief, the members of Guardhouse Nevada are Ms. Iacono and Dr. Dilley.  Ms. Iacono is an individual who, on information and belief, is domiciled in, and a citizen of, Nevada.  Dr. Dilley is an individual who, on information and belief, is domiciled in, and a citizen of, Indiana.

12.      Defendant Guardhouse Studios Italy S.R.L. ("Guardhouse Italy") is an Italian limited company with its principal place of business in Milan, Italy.  On information and belief, the members of Guardhouse Italy are Ms. Iacono and Dr. Dilley.

13.      Defendant Guardhouse Studios Management Limited ("Guardhouse Isle of Man") is an Isle of Man limited company with its principal place of business in the Isle of Man.  On information and belief, the members of Guardhouse Isle of Man are Ms. Iacono and Dr. Dilley.

14.     Defendant Guardhouse Studios Scotland Ltd. ("Guardhouse Scotland," and together with Guardhouse Nevada, Guardhouse Italy, and Guardhouse Isle of Man, "Guardhouse" or the "Guardhouse Companies") is a Scottish limited company with its principal place of business in Scotland.  On information and belief, the members of Guardhouse Scotland are Ms. Iacono and Dr. Dilley.

15.     Defendant Surya G. Iacono is an individual who, on information and belief, is domiciled in, and a citizen of, Nevada.

16.     Defendant Russell S. Dilley is an individual who, on information and belief, is domiciled in, and a citizen of, Indiana.

17.     On information and belief, Defendant L'Operateur is a French corporation with its principal place of business in France.

18.     Defendant GM Group is a Nevada corporation with its principal place of business in Nevada.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over all of Red Fort's claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.  In addition, this Court has subject matter jurisdiction over Red Fort's federal civil RICO claims against the Guardhouse Defendants, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Red Fort's other claims, pursuant to 28 U.S.C. § 1367.

20.     Although the relevant events, including the formation of the Loan Agreement, took place outside New York, each Defendant is subject to personal jurisdiction in this Court because each consented to jurisdiction here in the Loan Agreement (§ 9.17(b)) and/or the agreements related thereto.  In addition, this Court may exercise personal jurisdiction over the Guardhouse

Defendants pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure and 18 U.S.C. § 1965 based on their nationwide contacts and/or those of their co-conspirators (which relate to events taking place primarily in Puerto Rico, Nevada, and Indiana).

21.     Although the relevant events, including the formation of the Loan Agreement, took place outside New York, venue is appropriate in this District because each Defendant consented to jurisdiction and venue here in the Loan Agreement (§ 9.17(b)) and/or the agerements related thereto.  Venue is also proper in the interests of justice under 18 U.S.C. § 1965.

## BACKGROUND

### A.     The Guardhouse Companies.

22.     The Guardhouse Companies are supposed to be a network of film production companies co-owned by Ms. Iacono and Dr. Dilley.

23.     Ms. Iacono initially formed Guardhouse Nevada in about the mid-2000s (not long before filing personal Chapter 7 bankruptcy proceedings in 2007 in the U.S. District Court for the District of Nevada, 07-17838-mkn) (in that bankruptcy petition, Ms. Iacono falsely represented to the Court that she held no "[s]tock and interests in incorporated and unincorporated businesses").  At the time, Ms. Iacono was a flight attendant for United Airlines.  The company was initially based in Florida, but now is based in Nevada, where Ms. Iacono also is based.

24.     On information and belief, from the very beginning, Ms. Iacono used Guardhouse Nevada to run scams.  For example, on information and belief, Ms. Iacono told another flight attendant at United Airlines (referred to herein anonymously as "John Doe") that she was starting a movie production company and needed money for the venture.  Ms. Iacono said she wanted to take out loans for the company but needed to show potential lenders a source of collateral.  She assured him that her family was very wealthy and owned valuable property in Europe.  She also assured him that her movie production company would have a lot of money once it obtained the

loans she supposedly soon would secure.  Ultimately, on this basis, she convinced John Doe to put Ms. Iacono's name on the deed to his house so that Ms. Iacono could use the house as potential security to secure loans for Guardhouse Nevada.  On the basis of Ms. Iacono's story, John Doe also agreed to let Ms. Iacono move into the property on the condition that she pay monthly rent to John Doe.  But Ms. Iacono did not make the agreed payments and John Doe lost his property.

25.     As described herein, the scams became more elaborate over time.

26.     On information and belief, Dr. Dilley (an Indiana-based physician and investor) began discussions with Ms. Iacono about his potential involvement in the Guardhouse Companies in late 2015.  Since about 2016, Dr. Dilley has been the co-owner and principal funder of the Guardhouse Companies.

**B.     The Guardhouse Companies' Plan to Build Two Large Production Complexes and Their Supposed $400 Million Bond Offering to Finance That Project.**

27.     Beginning in early 2018, according to promotional materials provided to Red Fort, the Guardhouse Companies claimed to have been involved in the development of two "purpose-built, state-of-the-art, full-service film, television and media complexes" on 30 acres of land in Milan, Italy and 42 acres of land in Edinburgh, Scotland.  Guardhouse was planning to buy the land, build the studio complexes, and then rent space to media producers and offer various film production services.  The stated "vision" was "to be the destination of choice for international film and televisions producers."

28.     In support of this massive undertaking, the Guardhouse Companies claimed to have assembled a consortium of "45 entities" and a "global team" including various engineers, architects, film studio building specialists, marketing specialists, and various attorneys.

29.     The Guardhouse Companies also claimed to be financing the project principally from the proceeds of an upcoming $400 million bond offering, which purportedly was being

arranged by a private equity firm in Dubai, called SDI Capital.  Various law firms and Lockton (an insurance broker) also supposedly were working on the bond offering.

### C.     The Guardhouse Companies Seek Short-Term Financing to Pay Expenses Relating to and in Advance of Their $400 Million Bond Offering.

30.     Leading up to the supposed $400 million bond offering, the Guardhouse Companies claimed to be seeking bridge financing, ostensibly to pay various costs relating to the bond offering, as well as other company expenses.

31.     At least one of their ideas for raising short-term cash supposedly was to factor or obtain a loan backed by a corporate receivable.  Specifically, the Guardhouse Companies said that they were looking to obtain financing against a purported May 28, 2018 invoice for €2,371,823, issued to a French company called L'Operateur Partenaire Social ("L'Operateur") (the "L'Operateur Invoice").  (*See* Exhibit 1.)[1]  The L'Operateur Invoice supposedly was for services rendered and was due on October 15, 2018 (the due date later was extended to mid-November 2018).

32.     The L'Operateur Invoice states that it was billed to GM Group "on behalf of" L'Operateur, and to the attention of Herve Mazzocco (the principal executive of GM Group and who, on information and belief, also is affiliated with L'Operateur).  On information and belief, the Nevada-based GM Group functions as the alter ego of L'Operateur in the U.S. and is dominated and controlled by L'Operateur.  For example, in a letter dated September 26, 2018, the purported

---

[1]     Exhibit 1 is the copy of the L'Operateur Invoice attached to the Guardhouse Companies' papers in their now-dismissed lawsuit, which Ms. Iacono swore was "[t]he invoice at issue[.]"   In the course of the parties' discussions about a potential loan, the Guardhouse Defendants provided Red Fort several different — although slightly different — versions of the purported L'Operateur Invoice.  The reason for all these discrepancies is not known to Red Fort at tis time.  Nor is it known at this time whether the L'Operateur Invoice(s) reflect services actually provided to L'Operateur by the Guardhouse Companies.  These matters are currently under investigation.

attorney for both GM Group and L'Operateur, Arnaud Dubois, attached a "business overview" of GM Group and related companies, stating:

> I [] hereby certify the information presented in the attached document titled "GMGROUP_BUSINESS_OVERVIEW_2018" to be accurate and representative of the ongoing contracts and activities of "GM GROUP" and the group of companies lead by my client, Dr. Hervé Mazzocco.  I further attest that ***"GM GROUP" is a passive entity, it was created in 2016 with the purpose to allow Dr. Mazzocco's International companies and other foreign associates to operate in the USA***.

(*See* Exhibit 2 (emphasis added).)  In the attached business overview (also signed by Mr. Dubois), GM Group is listed as being involved in a project with L'Operateur, specifically serving as its "***[r]epresentation in the USA and Financial Proxy[.]***"  (*See* Exhibit 3 (emphasis added).)[2]

33.    The Guardhouse Companies say that their purported expenses incurred in connection with the alleged services to L'Operateur were paid personally by Dr. Dilley and Ms. Iacono.

**D.    The Guardhouse Companies Engage JCAP Global Co. to Assist Them in Finding Short-Term Financing and JCAP Reaches Out to the Capital Group.**

34.    In or about July 2018, Guardhouse engaged JCAP Global Co. ("JCAP"), a New Jersey-based broker of commercial real estate loans, to try to find a party willing to extend financing against the supposed L'Operateur Invoice.  They entered into a Professional Services Agreement, dated July 2, 2018.  JCAP agreed to use its best efforts to find a financing source willing to "factor and/or loan against" the L'Operateur Invoice.  Guardhouse agreed to pay JCAP

---

[2]    The Guardhouse Defendants sent these GM Group-related materials to a potential lender in Chicago in connection with the Guardhouse Defendants' effort to defraud that entity, as described in Paragraphs 70 to 71.  The September 26, 2018 cover e-mail from Ms. Iacono to the Chicago firm (which attached the above-referenced letter from Mr. Dubois) noted that "[a]s discussed, GM Group is a shell company in the US- Active but passive like me[.]  Letter from them explains all this . . . ."

"3% fee of the total amount lent to Guardhouse against the invoice."  The fee was to be payable "upon the first receipt of funds from the factor and/or lender," and the Guardhouse Companies expressly "authorize[d] the Lender who provides the loan and/or factor of this invoice to pay JCAP its Fee on demand from the first funds that Guardhouse receives."

35.     Ms. Iacono signed the JCAP contract on behalf of the companies.  She also guaranteed payment of JCAP's 3% fee "in a personal capacity."  On or about August 8, 2018, Dr. Dilley signed a personal guarantee with respect to "JCAP's arranging of the loan using an invoice generated by Guardhouse Productions as the loan collateral."

36.     After JCAP and Guardhouse agreed to terms, JCAP reached out to Chris Messina of The Capital Group, a New Jersey-based financial broker, to assist in finding the financing for the Guardhouse Companies.  Mr. Messina ultimately acted as an intermediary between Guardhouse and Red Fort.

> **E.      The Guardhouse Companies Have Trouble Finding a Party Willing to Extend Short-Term Financing Against the L'Operateur Invoice.**

37.     JCAP and Mr. Messina approached various institutions about factoring and/or lending against the L'Operateur Invoice, including Bibby Financial Services, Amerifactors, Stenn International, and Tradewind, among others.  Those approaches were unsuccessful.  At one point in this process, the Guardhouse CEO expressed frustration that Tradewind asked for financial information about Guardhouse.  She told JCAP that "we need a factoring situation . . .they won't approve me as I am too small, and do not have annual turnover."

38.     A typical factoring deal would have paid out approximately 73% to 74% face value on a receivable payable in three months.  But the financial institutions in the factoring business said that they were interested only in a longer-term relationship involving the purchase of multiple

regularly-issued invoices, not a riskier one-time invoice financing.  (In addition, it was later communicated to Red Fort that Bibby had been unable to obtain credit insurance on L'Operateur.)

39.     By mid-July, the Guardhouse Companies were unable to find a party willing to extend short-term financing against the L'Operateur Invoice, either by factoring or otherwise.

**F.     The Introduction to Red Fort.**

40.     In mid-July 2018, Mr. Messina reached out to Red Fort, a private equity real estate firm based in Puerto Rico.  Mr. Messina described the L'Operateur Invoice and explained that "out client is looking to discount it and get advanced monies. . . . [the Guardhouse CEO] is looking to move immediately if possible."  Mr. Messina later also raised the possibility of Red Fort "purchasing this [invoice] outright at a discount if that would expedite this transaction for the client."

41.     In that connection, the Guardhouse CEO had told Guardhouse's advisor, JCAP, that "we really cannot accept less than – at max – 75% of the face value, cash in hand, of the invoice." (Although Guardhouse had been unable to do so elsewhere, as described below, they were ultimately able to structure a loan with Red Fort that achieved a similar result.)

42.     In the next several weeks, the parties engaged in preliminary discussions about a potential deal.  Red Fort asked Guardhouse for more information about L'Operateur.  That information was slow in coming and sketchy.  For example, in a July 26, 2018 e-mail to JCAP, and copying Dr. Dilley, Ms. Iacono said that European privacy rules prevented sharing much financial information about L'Operateur, but insisted that "there is nothing wrong with invoice" and that L'Operateur was an A-rated credit.  The Guardhouse Defendants also provided Red Fort with a July 23, 2018 letter from L'Operateur's purported attorney Arnaud Dubois, in which Mr. Dubois stated:

> We can confirm that all of the work as outlined in the executed contract and listed in the attached invoice has been fully completed and we can further confirm that the company is fully prepared to make the payment in full for the amount of the invoice issued by Guardhouse Productions LLC upon its due date.

43.     Ms. Iacono also underscored the significance of the companies' studio development project and the supposedly upcoming $400 million bond offering.  She told Red Fort that "[a]s it stands now, the bond will be delivered in December."  She also stated that the Guardhouse Companies were also seeking "bridge funding . . . after the invoice is funded- to get us to December when the bank backed bond arrives."  She also noted that those debts would be covered by the proceeds of the $400 million bond:

> Bridge needed to get us to December: €14 M, and if further discussed all sources and uses of cash for the bridge we have extensively outlined – **And it will be wiped out by the bond.**

(emphasis added).

### G.     Red Fort Expresses Potential Interest and the Parties Draw Up a Letter of Intent.

44.     Red Fort runs a number of real estate investment funds and engages in large specialty finance projects.  This was not a typical deal for the firm and Red Fort perceived that it would incur a number of expenses in the deal.  But Red Fort was intrigued by the possibility of gaining experience in international video production.

45.     But Red Fort decided that it was ***not*** willing to make an outright purchase or factoring of the L'Operateur Invoice.  Red Fort was explicit that it was willing to explore a potential deal if — but only if — Red Fort had recourse against the Guardhouse Companies and their principals.

46.     The Guardhouse CEO had said she wanted a factoring deal because, "in factoring the onus is on the Invoice – not me."  But Red Fort told Mr. Messina that because Red Fort did not

know L'Operateur, "she is our our 'backstop . . . If she doesn't want to guarantee, NO deal." Mr. Messina replied: "She is the Back stop and she will guarantee that has been agreed and confirmed."

47.    The parties then executed an August 20, 2018 Letter of Intent for "Bridge/Receivable Financing" (the "LOI") explicitly along those lines.  The LOI outlined some key terms on which Red Fort would "consider" financing the L'Operateur Invoice (explicitly contemplating further discussions).  The economics contemplated by the LOI were that:

- Red Fort, as "Lender," would advance the Guardhouse Companies, as "Borrower," €1,529,825.80.  Upon L'Operateur's payment of the invoice, the advance would be repaid, and Red Fort would receive fees of €521,823.

- The Guardhouse Companies would "reimburse lender for Lender's attorneys' fees and costs" (the LOI explicitly reiterated that "the legal cost will be borne by the borrower in all circumstances.")  Red Fort's legal fees — then estimated at €29,914.50 — would be deducted from the initial disbursement.

48.    The LOI also specifically stated that Red Fort would have recourse against the Guardhouse Companies and the Guardhouse CEO personally, *i.e.*, expressly "Guarantees" were to include:

- "Personal Guarantee of Surya G. Iacono [Guardhouse CEO];"

- "Corporate of GuardHouse Productions LLC and Guardhouse Studios Management with UCC Lien"; and

- "Lien against First Use of Funds: If $ invested in any entity/real estate equity/bond offering etc. – UCC First Lien claims against them"

49.    After signing the LOI, the Guardhouse CEO told JCAP and Mr. Messina: "I want to do the bridge asap next."

50.    The LOI also contemplated a $10,000 application fee to be paid by the Guardhouse Companies.  On or about August 21, 2018, Dr. Dilley wired the $10,000 fee from his personal account to Red Fort.

51.     Although the financing was not contemplated to be structured as an outright sale or factoring, the advance contemplated by the LOI approximated the economics that the Guardhouse CEO had earlier discussed with the companies' outside financial advisor, JCAP (75% face value). The LOI contemplated a deal respecting only a ***portion*** of the invoice, and even of that portion, the Guardhouse Companies would receive 73%, *i.e.*, €1,499,911.30 would go to the companies, €521,823 to Red Fort, and €29,914.50 for legal fees. (As discussed below, the ultimate deal gave the Guardhouse Companies a higher initial disbursement (and a still higher commitment) and a lower amount reserved for Red Fort's expenses and fees.)

52.     In addition, Red Fort had raised up front that it wanted intermediary fees to be paid after Red Fort was paid back. JCAP, however, had insisted that it be paid by the Guardhouse Companies at closing (per the contract between JCAP and Guardhouse), so it was understood that some arrangement would be made to pay JCAP's fee out of proceeds or upon closing. It was also understood that Red Fort would pay Mr. Messina's intermediary fee (which was discussed at points to be 7%) after Red Fort was repaid by the Guardhouse Companies.

### H.     Red Fort's Due Diligence on L'Operateur Provides Little Comfort.

53.     After the parties signed the LOI, Red Fort continued to conduct due diligence on the potential transaction. Red Fort tried to get additional comfort about L'Operateur, but received only fishy information that heightened Red Fort's concerns. Among other things, Red Fort had received information that L'Operateur had little revenue and profits; Red Fort explained that it appeared that a "$2M+" payable was "significant money" to it. The Guardhouse Companies tried to wave away Red Fort's concerns, but Red Fort remained uncomfortable (that concern unfortunately turned out to be prescient, *see infra*).

### I.     The Parties Negotiate Potential Collateral and Guarantees for the Loan and the Guardhouse Defendants Provide Red Fort What Now Appear to Be

**Forged Documents Purporting to Show Ms. Iacono's Ownership of a Property in Rome.**

54.     Red Fort decided to negotiate for additional recourse in case L'Operateur did not pay.  The parties engaged in extensive discussions about what additional collateral or guarantees might be provided in support of the Guardhouse Companies' application.

55.     The Guardhouse Defendants suggested Red Fort take an interest in Guardhouse's anticipated $400 million bond offering.  Guardhouse provided a vague description of the offering, but claimed it could not give specifics: "Why?  I do not have [SDI's] permission, and their mechanism is proprietary."  Red Fort replied: "We can't see the value of the cover for us in what you sent below." The Guardhouse Defendants nevertheless continued to play up the supposedly imminent bond offering, for instance, suggesting in October 2018 that Red Fort might "take a lien on the bond," which was supposedly just about to come through (Ms. Iacono claimed "they are waiting for us- the contract is in my inbox and is the very next contract we are executing . . . .").

56.     Instead, Red Fort focused on the possibility that the Guardhouse CEO might bolster her personal guarantee by granting Red Fort a collateral interest in property she claimed to own in Rome.  Specifically, she had represented to Red Fort that she owned real estate near the Coliseum (at via Nicola Salvi n. 68, piano 2) worth approximately €5.6 million.

57.     For example, by e-mail on August 21, 2018, Ms. Iacono provided Red Fort (via Mr. Messina) with a purported "Personal Finance Breakdown for Ms. Surya G. Iacono."  (*See* Exhibit 4.)  This document purported to be a letter from Curtis W. Dankert (Dr. Dilley's personal accountant in Indiana), in which Mr. Dankert purportedly stated: "I have reviewed the financial information of the Guardhouse entities and Ms Iacono in my role as accountant and financial advisor to Dr. Russell Dilley, the minority partner."  The letter identified various purported assets of Ms. Iacono, including:

**Home in Rome**:

*Via Nicola Salvi #68, Roma, Italia 00184: Market Value last December 2017, €5.6 Million[.]*

(emphasis added). Other purported assets included a claimed interest in an $8.7 million trust account and $692,780 in a 401-K account. Shortly after receiving this purported "Personal Finance Breakdown," Red Fort contacted Mr. Dankert to confirm that he knew Ms. Iacono and how (but without asking about the document itself). Mr. Dankert said he knew Ms. Iacono as Dr. Dilley's business partner.

58.     In reality, and as set forth in more detail in Paragraph 116, this purported "Personal Finance Breakdown for Ms. Surya G. Iacono" was not prepared or sent by Mr. Dankert and appears to be a ***forgery***. On information and belief, the Guardhouse Defendants acted together, and with each other's knowing agreement, approval and/or participation, to list Ms. Iacono's purported assets on Mr. Dankert's letterhead and fraudulently affix Mr. Dankert's signature thereto (they had access to the letterhead and signature because of Dr. Dilley's long business relationship with Mr. Dankert) and then provided it to Red Fort. The idea apparently was that Ms. Iacono's claimed personal wealth would have a veneer of plausibility if vouched for by a certified accountant.

59.     In reality, on information and belief, Ms. Iacono does not have the substantial net worth claimed in the forged net worth statement that the Guardhouse Defendants provided to Red Fort. Indeed, on information and belief (as Red Fort has since learned), as of 2015, Ms. Iacono was living out of an economy motel, from which she eventually was evicted.

60.     By e-mail on October 1, 2018, Ms. Iacono also provided Red Fort (via Mr. Messina) with a document from the Italian property registry purporting to evidence Ms. Iacono's ownership interest. In her e-mail, Ms. Iacono stated, "[p]lease find attached the house doc to move forward[.]" The document shows Ms. Iacono as 100% owner of the property. (*See* Exhibit 5.)

61.     In reality, and as set forth in more detail in Paragraphs 109 to 115, Ms. Iacono does not own this or any other property in Rome, and the purported land registry document also is a *forgery*.  On information and belief, Ms. Iacono created this forgery and delivered it to Red Fort with the knowing agreement, approval, and/or participation of the other Guardhouse Defendants.

62.     On numerous other occasions throughout the negotiation process, Ms. Iacono shamelessly repeated the lie that she owned the Rome property and strenuously resisted involving the property in the deal (in retrospect, it appears that this resistance was motivated by a desire to prevent Red Fort from more closely examining the Guardhouse Defendants' fraudulent claim that Ms. Iacono owned the property).  Only a few such examples are listed here:

- In a September 6, 2018 e-mail, Ms. Iacono objected to Red Fort documenting its interest in the property in a particular manner: "I don't know anyone well enough to trust- that when given a legal document that essentially signs away the rights to *my €5.6 million property*- without recourse- that they will do the right thing and not call upon it." (emphasis added).

- In a similar exchange on September 6, 2018, Ms. Iacono stated: "*My home is worth €5.6 million Euros or close to 8 million US- so 2 1/2 times the invoice*- and I will not give anyone the right to sell my home- once they have been paid[.]*" (emphasis added).

- In an October 7, 2018 e-mail, Ms. Iacono stated "I have given Parry my POA of attorney stateside and *my house falls into and is listed as part of my assets – I am named on my home, so it is my asset and part and parcel of my estate* – and I have given Parry the right to record a mortgage against my home," which she repeated was "*valued at around $8 million US* . . . ." (emphasis added).

On information and belief, each of these and Ms. Iacono's other false representations of property ownership were made with the knowing agreement and/or approval of each other Guardhouse Defendant.

63.     Red Fort did not know the true facts at the time, and in reliance on the accuracy of the Guardhouse Defendants' various false representations and forged documents, the parties

engaged in extensive discussions on how the Rome property might be used to guarantee the Guardhouse Companies' debt.

64.     The issue of granting Red Fort mortgage rights was a flash point for Ms. Iacono and she threatened to pull out of the deal.  During these many ongoing discussions about the Rome property, the Guardhouse CEO repeatedly referenced legal advice she was receiving on the issue in an effort to avoid having the Rome property involved in the deal and/or to conceal the fact that the Guardhouse Defendants had fraudulently misrepresented that Ms. Iacono owned the property. For example:

- In an August 27 e-mail, the Guardhouse CEO stated: "*I said I must speak to my attorney – which I did today- I made that very clear last week that before I can say yes, I must speak to my attorney.  Today, I have already given you all an update of what he said and advised. . . .  I already stated that before I agreed to the house that I had to speak with my attorney who only today was back in the office.*"  (emphasis added).

- In the same exchange, the Guardhouse CEO stated: "*After a long call with my lawyer* this morning – here is where things stand. . . . "  She went on to explain the role of notaries in Italy, and noted that "*my attorney can draft up the letter to attach to the title*"; and "*I can have the attorney draft up the document*"; and "*that's what my Italian attorneys do as well[.]*" (emphasis added).

- In another August 27 e-mail, the Guardhouse CEO said: "*My attorney has not advised me to do the land deal-* he said it was up to me[.]"  (emphasis added).

- In an August 29 e-mail, the Guardhouse CEO said, with respect to power of attorney documents, "*I will use my Italian lawyer* under you/ or your lawyers written instructions."  (emphasis added).

- In a September 6 e-mail, the Guardhouse CEO said: "*I checked with two Italian lawyers*"; and "*BOTH ATTORNEYS TOLD ME TO BE VERY VERY CAREFUL BEFORE SIGNING SUCH A DOCUMENT* AS THERE IS NO RECOURSE FOR ME DURING THE TIME THAT IT IS IN FORCE."  (emphasis added).

- In another September 6 e-mail exchange, the Guardhouse CEO stated, "*I am repeating verbatim what two Italian attorneys have said to me- just this morning- both in real estate and finance. . . .  [A]ccording to the Italian attorneys-* once that document is signed- Parry can sell my home . . . ." (emphasis added).

- In another September 6 e-mail, the Guardhouse CEO said: "*My attorney's do not reccommend that I do this deal at all- They have counseled me against it*. . . . If you and Parry want to come up with another solution I am open to it- but *I am not going t[o] sign any such document against the advice of my Italian attorneys.*" (emphasis added).

65.    These and other such references to Italian legal advice were a subterfuge designed to induce Red Fort into agreeing to a more diluted security interest in the Rome property. The idea apparently was that if enough seemingly complicated Italian legal obstacles were put in the way, Red Fort would not push too hard in its due diligence on the property. And as it turns out, the various representations about taking Italian legal advice appear to have been false. Indeed, in their now-withdrawn lawsuit, the Guardhouse Companies repeatedly claimed that they "had no legal representation and were never advised nor given the option to seek legal aid."[3]

66.    The Guardhouse Defendants' scheme worked — Red Fort agreed to dilute its mortgage rights, and the Guardhouse CEO proposed having her lawyer draft an agreement about the Rome property that would satisfy her. Red Fort did not do its own search of Italian property records until after the Loan Agreement was executed (and only then did it learn about the Guardhouse Defendants' fraud).

67.    Ultimately, Ms. Iacono provided Red Fort with powers of attorney purporting to authorize Red Fort to take a mortgage against her supposed Rome property:

- A Nevada Limted Power of Attorney, notarized in Nevada on October 9, 2018, gave Red Fort's CEO a limited power of attorney to act as Ms. Iacono's attorney-in-fact to "[*d]raw up and Execute a mortgage against my home in Rome Italy*, at: via Nicola Savli #68 Piano 2 (2nd Floor) 00184[.]" (emphasis added).

- A Special Power of Attorney, apparently executed in Milan, Italy, appointed Red Fort's CEO as Ms. Iacono's attorney "for the purpose of *drawing up and executing*

---

[3]    They made this allegation in support of their meritless (and borderline frivolous) argument that the Loan Agreement is unenforceable because they were not represented by counsel in agreeing to it.

*a mortgage" against "the real estate asset in Rome Italy*, at via Nicola Savli n. 68, 2nd floor[.]" (emphasis added).

**J.     The Parties Continue to Discuss Various Deal Points.**

68.     In the meantime, the parties continued to discuss other deal points, including the amount that the Guardhouse Companies would receive, payments to Red Fort (for its expenses and fees), arrangements for collateral and guarantees in the event of a default (including a personal guarantee by Guardhouse's prinipcal funder Dr. Dilley), and the loan structure.

69.     The Guardhouse Companies said they wanted a larger disbursement than what was contemplated in the LOI.  The parties ultimately agreed on a €1,750,000 initial disbursement going to the Guardhouse Companies, with a separate €500,000 amount allocated to Red Fort at that time (for its expenses and fees).  In an October 1 e-mail, Mr. Messina reported that

> [The Guardhouse CEO] is prepared to move forward with the transaction as it related to our last conversation of structuring the transaction as an advance against the invoice in the net amount of 1.75m Euro's with a total fee of 500K Euro and in the event of non-payment we file a mortgage against the property.

The Red Fort CEO replied, copying the Guardhouse CEO, "[w]e are happy to disburse as below," and set out a chart showing some of the financial terms, including €1,750,000 as initial disbursement and €500,000 to Red Fort (for expenses and fees).

**K.     Guardhouse Lies to a Different Potential Lender About Property Ownership.**

70.     In this timeframe, the Guardhouse CEO told Mr. Messina that they had a term sheet from another potential lender respecting the L'Operateur Invoice and were two weeks away from doing a deal with them.  The Guardhouse CEO told Mr. Messina that she nevertheless wanted to close with Red Fort because she believed the deal with them would close faster.  She also said the companies were willing to pay Red Fort's expenses and fees for quick cash because they were

using the loan as a bridge to the $400 million bond offering; any such costs would be insignificant in the larger picture.

71.   The Guardhouse Companies also were seeking $50 million in project financing from this same source, a Chicago-based firm.  The financing was supposed to be for building film studios on land in Scotland and Milan.  In connection with that application, in or around July 2018, Ms. Iacono had made various representations that Guardhouse already owned the property at issue.  She also highlighted her connection with the personally wealthy Dr. Dilley.  Ultimately, in about October 2018, the transaction fell apart when the Chicago firm learned that Guardhouse's representations of property ownership were false.  The Chicago firm also backed out of the L'Operateur Invoice financing deal for the same reasons.

**L.   Dr. Dilley's Guarantee and Personal Check.**

72.   As negotiations with Red Fort continued, the parties turned to the possibility of Dr. Dilley providing an additional personal guarantee on the loan.

73.   In an October 4, 2018 e-mail to Ms. Iacono and Red Fort's CEO, Mr. Messina reported, based on a conversation with Ms. Iacono, that:

> From my calls with each of you independently I believe we have a simple solution that will eliminate the Italian component 100%.
>
> Dr. Dilly who is Surya's business partner has agreed to produce a post dated check in the amount necessary to cover the advance against the invoice. This check will be coming from either Citibank or a AAA US bank. Dr. Dilly has assets spread throughout various institutions ie. Morgan Stanley, JP Morgan Chase etc. which more than covers the amount of the check that will be provided.
>
> Mr. Kurt Dankert who is the Dilly estate money manager who operates all the assets and moves the estate money for them will be providing a letter that upon Dr. Dilly's instruction will move the necessary assets to cover the check.
>
> A simple mortgage and note to RedFort will be held in escrow along with the check.

74.     On October 7, 2018, Guardhouse sent to Red Fort various documents respecting Dr. Dilley's guarantee of the loan.  This included a purported October 5 letter from Mr. Dankert, which was further signed by Dr. Dilley.[4]  A copy of a personal check (#3084) from Dr. Dilley in the amount of $2,732,340 also was attached.  Guardhouse informed Red Fort that the check itself was being sent in the mail.

75.     However, Red Fort did not accept any terms in the supposed letter from Mr. Dankert and did not wait for the #3084 check to arrive in the mail.  Instead, on or about October 9, 2018, Red Fort's CEO travelled to Indiana to meet with Dr. Dilley in person.  At that meeting, Dr. Dilley confirmed that he was Ms. Iacono's business partner and provided the Red Fort CEO with a different personal check (#3085) made payable to Red Fort in the amount of $2,732,340, and post-dated to January 15, 2019.  This check was delivered pursuant to Dr. Dilley's personal guarantee of the Loan Agreement, and pursuant to its terms, and served as partial security in connection therewith.  It was understood and later agreed in writing in the loan documentation that Dr. Dilley's personal guarantee was uncapped and not limited to the amount of the check.

**M.     L'Operateur Agrees to Repay the L'Operateur Invoice Directly to Red Fort.**

76.     In connection with Red Fort's contemplated security interest in the L'Operateur Invoice, Red Fort sought confirmation that the invoice would be paid directly to Red Fort.  By letter dated October 8, 2018, L'Operateur's purported attorney agreed to that arrangement:

> I hereby confirm, on behalf of « L'Operateur Partenaire Social »,
> that we have been informed that Guardhouse Productions has
> contracted with Red fort Capital Inc. to factor the [L'Operateur
> Invoice].

---

[44]   As described in more detail at Paragraph 116, this letter also may have been forged.

> « L'Operateur Partenaire Social » acknowledges the aforementioned
> and agrees to wire the money directly to Red Fort Capital on the due
> date of November 15th, 2018 to [Red Fort's bank account].

77.     Red Fort asked for confirmation directly from L'Operateur's CEO Cedric Bistue (or another authorized person at the company).  By e-mail on October 10, Mr. Bistue (or at least someone claiming to be him) provided that confirmation:

> I cédric Bistue acknowledge that Arnaud Dubois is my fully
> authorized representative attorney. . . .
>
> I also further acknowledge as President of my company l'Operateur
> Partenaire Social, that l'Operateur Partenaire Social will not pay the
> invoice to Surya G. Iacono and Guardhouse Productions, but will
> instead now directly pay Red Fort Capital on or before its due date.

**N.      Finalizing the Loan Agreement.**

78.     As the parties neared an agreement, the Guardhouse CEO continued to express frustration that Red Fort was negotiating for stronger guarantees, although she ultimately consented to them.  In an October 7 e-mail, she noted: "I am freaking out about the POA- in Italy- I will do it- but I am in serious legal risk and Parry is getting now three to four guarantees/backstops."  In an October 9 e-mail, the Guardhouse CEO again expressly acknowledged the various collateral and guarantees Red Fort was getting: "Parry has three backups right now- The Invoicee[;] My house[;] And Dr. Dilley's check[.]"

79.     From  October 8 to October 10, the parties finalized the Loan Agreement.  The Guardhouse CEO made detailed comments on drafts.  For example, on October 9, the Guardhouse CEO proposed various edits to the then-current draft, noting (among several other points) that "***[m]y lawyer needs a section added*** that explicitly states what happens when the loan is repaid in full on time[.]" (emphasis added).  She also proposed revising the amount of the loan commitment (at that point proposed to be €2,087,204) to ensure that, once fees were removed, Guardhouse would have a net of €1.75 million:

> Lastly- Please **explain why the loan agreement has me borrowing 2 million and change but Chris [Messina] and I always discussed 1.750 net**- since 1.750 is the net I get that must be explicitly listed and stated for AML purposes or I will get in trouble- **I understand that there are fees being withheld – so all amounts- both before and after figures must be included- the difference between the invoice value and what I am netting must be listed therein**.

(emphasis added). Red Fort responded to the various points. As to the comments about the amount of the loan, Red Fort confirmed: "**1.75M + 500K = 2.25M = Will correct amount and resend**." (emphasis added).

80.     Shortly thereafter, Red Fort circulated a revised draft of the Loan Agreement in redline. On the first page of the draft (and elsewhere), the commitment amount of €2,087,204 was crossed out in red and was replaced with a larger commitment amount of €2,550,000.

81.     The revised draft also showed (in redline) an initial disbursement amount of €1,750,000 (per the Guardhouse CEO's request the €500,000 principal amount being used to pay Red Fort's expenses and fees on the initial disbursement date was called out separately in the document). The revised draft also added language proposed by Guardhouse about the termination of their obligations upon repayment.

### O.     Executing the Loan Agreement.

82.     After receiving the October 9 redline draft from Red Fort, the Guardhouse CEO signed and returned this document, **initialing each page** (*i.e.*, the same document that in red track changes showed a commitment amount of €2,550,000, an initial disbursement of €1,750,000, and initial fee of €500,000). Red Fort's attorneys pointed out that the Guardhouse CEO had signed a redline document and that the agreement had not been finalized yet. The Guardhouse CEO said she would re-sign clean versions the next day:

> All copies- that is both word and pdf- say draft at the top- I have no other version than that- Please get me a version I can download, and then sign and send back and the originals to CC Milan- I will

> overnight them tomorrow morning as its 10.30 pm here[.]

Red Fort explained that there were a few open minor points to be confirmed, and over the next few hours, these outstanding issues were resolved.

83.     Later that evening, Red Fort's CEO sent an execution version of the agreement to the Guardhouse CEO.  Mr. Messina asked her to "execute and return via email right away."  The Guardhouse CEO signed the full execution version and emailed it back to Mr. Messina on October 10.  (*See* Exhibit 6.)  Mr. Messina sent it to Red Fort, and counsel then added the October 10 date (and corrected the table of contents and some formatting).  Red Fort then emailed the Guardhouse CEO a fully executed version of the Loan Agreement.  (*See* Exhibit 7 ("Loan Agreement").)

**P.     The Loan Agreement.**

84.     The October 10, 2018 Loan, Security and Guaranty Agreement (together with related documents, the "Loan Agreement") was entered by and among the Guardhouse Companies (as Borrowers), Red Fort (as Lender), and Ms. Iacono (as Guarantor), as well as Dr. Dilley, who separately acceded to the Loan Agreement as a Guarantor by an October 10 Letter of Accession. (L'Operateur later acceded to it as well, as described at Paragraphs 96 to 97.)

85.     Among the principal terms of the Loan Agreement were the following:

86.     *First*, the Guardhouse Companies would receive an initial disbursement of €1,750,000, plus initial fees of €500,000 at that time.  It was expressly contemplated that the Guardhouse Companies were borrowing the money in order to invest in their proposed movie studios in Italy and Scotland and to pay certain expenses of the transaction, among other things. (Loan Agreement "Whereas" Clause & § 5.8.)

87.     *Second*, the loan was required to be repaid in full by January 15, 2019.  However, the loan could be accelerated if an "Event of Default" occurred, which was defined to include the

Borrowers or the Guarantor "bring[ing] an action to limit its obliations or liabilities" under the Agreement.  (Loan Agreement § 8.1(f).)

88.     ***Third***, Article 7 of the Agreement provides that the Guarantor "absolutely, unconditionally and irrevocably" guarantees "the full and prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise" all amounts due under the loan.  (Loan Agreement § 7.1(a).)  The Guarantor further "unconditionally and absolutely waives," among other things, "the invalidity or unenforceability" of the debt, as well as "notice of presentment, demand for payment, notice of non-performance, protest, notices of protest and notices of dishonor, notice of non-payment or partial payment[.]"  (Loan Agreement § 7.1(f).)  The Agreement also provided:

> Without limiting the generality of the foregoing, the Guarantor will not assert against the Lender any defense of waiver, release, discharge in bankrtupcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, ultra vires acts, usury, illegality or unenforceability which may be available to the Borrowers in respect of the Indebtedness Guaranteed . . . .

(Loan Agreement § 7.1(g).)

89.     In connection with Ms. Iacono's personal guarantee, a condition of the Agreement was that Ms. Iacono provide Red Fort with power of attorney documents "appointing [Red Fort] as her attorney-in-fact to prepare, execute and take all actions necessary to facilitate the validity and perfection of a mortgage over her residence loated at VIA NICOLA SALVI n. 68 piano: 2, Rome, Italy if the Loan is not irrevocably repaid in full by November 30, 2018."  (Loan Agreement § 3.1(l).)   As referenced above, Ms. Iacono provided Red Fort with Italian and Nevada power of attorney documents (which turned out to be worthless because she does not own the property). Ms. Iacono also provided Red Fort with a letter from her purported Swiss banker confirming that she had a €1,500,000 line of credit with that institution, as well as a letter from herself stating that,

if Red Fort took a mortgage on the Rome property, she would "make best efforts to have the swiss bank [] retire the mortgage . . . ."

90.     In connection with his personal guarantee, Dr. Dilley executed a separate accession document, stating that he "agrees to be bound by the terms of the Agreement as a Guarantor, and hereby agrees to the provisions of Article 7 of the Agreement, *mutadis mutadis*."  A condition of the Loan Agreement was that Dr. Dilley provide a "certificated check post-dated to no later than January 15, 2019, in the amount of $2,732,340."  (Loan Agreement § 3.1(j).)  As described above, Dr. Dilley provided Red Fort with a $2,732,340 personal check post-dated to January 15, 2019.

91.     ***Fourth***, in addition to the personal guarantees of Ms. Iacono and Dr. Dilley, Red Fort was given a direct security interest in the L'Operateur Invoice (among other purported Guardhouse assets, collectively, the "Collateral"), and a condition of the Agreement was that Guardhouse direct L'Operateur to pay Red Fort directly.  (Loan Agreement §§ 2.1(d), 3.1(i).) Guardhouse also represented and warranted that it had "good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder . . . ."  (Loan Agreement § 4.14.)

92.     ***Fifth***, Red Fort is entitled to recover all of its costs and expenses (including attorneys' fees) in connection with the loan:

> Each Borrower agrees to pay or reimburse upon demand . . . the Lender for all reasonable and documented out-of-pocket costs and expenses (including Attorney Costs) incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy, or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Borrower, the Guarantor, any Subsidiary of any Borrower, any Loan Document or Obligation (or the response

to and preparation for any subpoena or request for document production relating thereto), including Attorney Costs.

(Loan Agreement § 9.4.) "Attorney Costs" are defined as "all reasonable fees and disbursements of any law firm or other external counsel to the Lender." (Loan Agreement, Definitions.)

**Q. The Guardhouse Companies Receive the Loan Proceeds; Red Fort's Costs.**

93. On October 10, after the Loan Agreement and related documents were fully executed, Red Fort disbursed €1,750,000 to the Guardhouse Companies.

94. Ms. Iacono had requested that Red Fort wire the money not to Guardhouse's corporate account, but to her own personal Swiss bank account. Red Fort acceded to this request, and so wired $1,982,271 from its Puerto Rico bank account to Ms. Iacono's purported Swiss bank account. At Ms. Iacono's express authorization (*see* Exhibit 8), Red Fort also wired an additional $38,910 to JCAP to pay half of the fee Guardhouse owed to JCAP (and the next week, Guardhouse separately paid the second half of JCAP's fee from Ms. Iacono's Swiss bank account).

95. In addition to the amounts disbursed, Red Fort has incurred significant expenses in connection with the Loan Agreement. These include, among others, underwriting and due diligence costs, attorneys' fees (including in connection with this litigation and the now-withdrawn Guardhouse Lawsuit), brokers' fees, internal currency exchange hedging costs (the loan was denominated in Euros), and various other administrative expenses and costs.

**R. L'Operateur and Its Alter Ego GM Group Enter a Payment Agreement With Red Fort.**

96. On November 6, shortly before the L'Operateur Invoice was due, Red Fort was informed that L'Operateur did not want to make a payment outside of Europe for supposed "tax" reasons. To address this alleged concern, Red Fort, L'Operateur, and the Guardhouse CEO executed a November 7 "Agreement relating to repayment of invoice and loan" (the "L'Operateur Payment Agreement"), pursuant to which it was agreed that L'Operateur would pay Guardhouse

(instead of Red Fort, as previously agreed), and Guardhouse would then pay Red Fort.  (*See* Exhibit 9.)  GM Group was a party to the agreement as L'Operateur's alter ego.

97.     The L'Operateur Payment Agreement expressly referred to and thus incorporated the "Loan, Security and Guaranty Agreement dated as of October 10, 2018 among Guardhouse Productions, LLC, the other borrowers party thereto, Surya Iacono as guarantor ('Ms. Iacono'), and Red Fort Capital, Inc., as lender ('Red Fort') (the 'Agreement')."   The contract recited that the L'Operateur Invoice was intended to be repaid on November 9, 2018 (the "Payment Date"), and that the proceeds thereof would be used to repay the amounts owed under the Loan Agreement.  It was expressly agreed, among other things, that:

> Notwithstanding any prior arrangements relating to the aforementioned payments, the parties acknowledge and agree that:
>
> - ***The Payor [L'Operateur] shall pay, in immediately available funds, to Ms. Iacono the entire outstanding balance under the Receivable [the L'Operateur Invoice]***, to the bank account identified below [Ms. Iacono's Swiss bank account].
>
> - Ms. Iacono shall, upon receipt of funds as aforementioned on the Payment Date, issue the instructions attached hereto as Exhibit A to transfer all such funds to an account designated by Red Fort in writing to Ms. Iacono.
>
> . . .

(emphasis added).   It was agreed that New York law would govern the L'Operateur Payment Agreement.

98.     Notwithstanding that payment was due on November 9, 2018, L'Operateur's purported legal counsel informed Red Fort on November 15 that L'Operateur "is currently facing administrative and fiscal constraints that will require more time before the funds can be released." On November 19, he provided a flimsy excuse about France being "blocked by social movements." Red Fort promptly notified L'Operateur's purported attorney that L'Operateur was in default.

**S.      Red Fort Asks the Guardhouse Companies About Repayment.**

99.     In a December 4, 2018 e-mail to Ms. Iacono and Dr. Dilley, among others, Red Fort noted that L'Operateur had failed to pay.  Red Fort also noted that because the Guardhouse Companies had not repaid the loan by November 15, increased interest rates in the Agreement had kicked in.[5]

100.    On December 12, 2018, Red Fort provided Ms. Iacono and Dr. Dilley, among others, with a breakdown of amounts due.  This included the €2,250,000 initial principal, plus interest on that amount, plus an estimate of legal fees as of that time.

**T.      The Guardhouse Companies Bring (and Then Withdraw) a Baseless Lawsuit in New York Designed to Conceal the Guardhouse Companies Fraud.**

101.    On or about December 12, 2018, the Guardhouse Companies commenced a baseless lawsuit against Red Fort and its CEO in the New York Supreme Court for New York County, *Guardhouse Productions LLC et al. v. Singh et al.*, No. 656185/2018 (the "Guardhouse Lawsuit").  They alleged that the Loan Agreement was invalid (and that Red Fort had breached it) for a variety of factually untrue and borderline frivolous purported legal reasons.

102.    The next day, the Guardhouse Companies sought an *ex parte* TRO and a preliminary injunction.  In light of the Guardhouse Defendants' fraud that has now come (at least partially) to light, that TRO was a transparent attempt to prevent Red Fort from investigating and uncovering the Guardhouse Defendants' fraudulent activities: the Guardhouse Companies asked the state court to enjoin Red Fort from contacting supposed Guardhouse clients and "business associates" and from placing a mortgage on the Rome property that the Guardhouse Defendants

---

[5]    Red Fort's CEO colloquially characterized this as a "default" under the Loan Agreement, although technically it only resulted in increased interest due.  Red Fort did not declare an Event of Default until after the commencement of the Guardhouse Lawsuit.

had fraudulently said Ms. Iacono owned.  The state court denied that baseless TRO application and set a hearing on the preliminary injunction for January 17, 2019.

103.    Shortly thereafter, Red Fort's counsel reminded the Guardhouse Companies' counsel that the Loan Agreement provided that Red Fort was entitled to all its attorneys' fees in any litigation relating to the loan.  The Guardhouse Companies nevertheless did not initially withdraw their complaint or preliminary injunction motion, thus requiring Red Fort to incur significant (and needless) attorneys' fees and other costs relating to preparing factual and legal responses to Guardhouse's preliminary injunction motion.

104.    On January 6, 2019,  Red Fort removed the Guardhouse Lawsuit to this Court, 19 Civ. 128 (KPF) (S.D.N.Y.).

105.    On January 8, 2019 (*i.e.*, after Red Fort had already incurred significant expense drafting a response to the preliminary injunction motion), the Guardhouse Companies finally got around to withdrawing their meritless suit, which they did by filing a voluntary notice of dismissal.

**U.      The Guardhouse Companies and Their Guarantors Fail to Pay.**

106.    In the meantime, on December 14, 2018, after the Guardhouse Companies filed suit, Red Fort declared an Event of Default under the Loan Agreement.  Red Fort demanded immediate repayment of all amounts due.  Neither the Guardhouse Companies, Ms. Iacono, nor Dr. Dilley have paid any amounts due.

107.    Red Fort also has been unable to obtain relief by other methods available under the Loan Agreement.  For example, as described in Paragraphs 109 to 115, Red Fort has no practical ability to record a mortgage on Ms. Iacono's purported Rome property because she does not own the property.  And on January 14, 2019, Defendants' attorneys informed Red Fort that payment was being stopped on Dr. Dilley's personal check.  As referenced above, L'Operateur also has refused to pay.

## V.      Red Fort's Investigation of the Guardhouse Defendants' Fraud.

108.      Since the underlying events described herein, Red Fort has begun to conduct an investigation of the transaction and the Guardhouse Companies more generally.  That investigation is still ongoing, but has begun to reveal at least certain aspects of the Guardhouse Defendants' fraudulent scheme.

109.      On December 17, 2018, Red Fort requested that an Italian notary public (the "Italian Notary") search the official land registry to verify the title to and any existing encumberances over the previous 20 years in relation to the property Ms. Iacono claimed to own at Nicola Salvi 68, Rome, Italy, cadastral identification at sheet 500, map 129, unit 14 (the "Rome Property").  (The Italian Notary is a public official in Italy whose responsibilities include guaranteeing that property is sold validly and by a seller with proper and valid title, and that a mortgage on property is created only by a person who is the owner of the property as shown in the official land registry.)

110.      On December 28, 2018, the Italian Notary provided Red Fort with:

(a)      an electronic land registry extract (*visura storica per immobile*) of the Rome Property updated as of December 21, 2018.  The land registry extract (*visura storica per immobile*) is an electronic document extracted directly by the Italian Notary which reflects the electronic records of the land registry as of that date.  (*See* Exhibit 10.)

(b)      an electronic extract of a search (*ispezione ipotecaria*) done by the Italian Notary on December 28, 2018 showing that no result appeared under the name Surya Iacono in the electronic land registry of Roma 1 as owner of a property or beneficiary of other right.  (*See* Exhibit 11 (which includes an informal translation thereof).)

111.      On January 7, 2019, the Italian Notary provided Red Fort with a notarial report (the "Notarial Report") on the Rome Property describing the ownership status and any existing encumberances over the previous 20 years of the Rome Property and attaching a further land

registry extract (*visura storica per immobile*) of the Rome Property updated as of January 7, 2019. (*See* Exhibit 12 (which includes the notarial report and an informal English translation thereof).)

112.    The Notarial Report states that Giuseppe Saporano (***not*** Ms. Iacono) owns the Rome Property, while Lello Emanuele Iacono and Maria Valente have a right of usufruct (*diritto di usufrutto*) on the Rome Property, which, in general terms, is a lifetime right of use, lease, and residence.

113.    Because Ms. Iacono is not listed as the owner of the property in the official land registry, it is therefore not possible for an Italian notary to proceed with the execution of a mortgage deed or registration of a mortgage over the property on the basis of the Italian power of attorney provided by Ms. Iacono to Red Fort.

114.    The purported *Visura per immobile* document provided by the Guardhouse Defendants (*see* Exhibit 5) is materially different from the true property record obtained by the Italian Notary.   Among other things, the Guardhouse Defendants' version purports to show Ms. Iacono as the 100% property owner, and shows Lello Iacono and Luca Emmanuele Nels Eastguard-Iacono (Ms. Iacono's son) as having rights of usufruct.   There is no mention of the true owner Giuseppe Saporano or of Maria Valente, who holds usufruct rights.

115.    A close examination of the Guardhouse Defendants' version confirms that their document is a forgery.   (*Compare* Exhibit 5 *with* Exhibit 10.)   The purported date of the Guardhouse Defendants' document is inconsistently listed as both September 22, 2018 and February 22, 2018.   The entry listing Ms. Iacono as 100% property owner appears to be out of alignment with the other entries, as does the listing for her son.   The forgery is even more evident when the ".pdf" document provided by the Guardhouse Defendants is uploaded to the free Google

Translate online electronic translation service (and other such services).[6]  This clearly shows that, in the Guardhouse Defendants' document, Ms. Iacono's name has been superimposed over the name of the true owner, Giuseppe Saporano.  It is also clear that the date in the upper right hand corner of the document was edited.  At least portions of the original data are apparently still contained in the .pdf file (*i.e.*, Mr. Saporano's name and the original date in the upper right hand corner), although not visible when simply opening the .pdf file.  A copy of the output from Google Translate on the electronic document originally provided to Red Fort by the Guardhouse Defendants is attached as Exhibit 13.

116.    Red Fort's investigation also has revealed that the August 21, 2018 "Personal Finance Breakdown for Ms. Surya G. Iacono," which the Guardhouse Defendants provided to Red Fort and which lists the Rome Property as a purported asset of Ms. Iacono, also was a forgery. That document was purportedly prepared by Curtis Dankert (Dr. Dilley's long-time Indiana accountant).  However, Mr. Dankert has since confirmed that he did not prepare any financial statement for Ms. Iacono and that he only does taxes.  An examination of the document itself further indicates that it is a forgery.  Among other things, it does not appear that Mr. Dankert physically signed the Personal Finance Breakdown.  Rather, the signature appears to be an electronic cut-and-paste (or a stamp or some other copy of a signature), which is in all respects identical to Mr. Dankert's purported signature on the October 5 letter referencing Dr. Dilley's personal check (#3084), described at Paragraph 74 (*e.g.*, including the same blank space underneath and between the "C" and the "u" of "Curtis").  The Personal Finance Breakdown also

---

[6]    This exercise can be done with the purported *Visura* document attached to Exhibit 5 hereto. Red Fort also will make available to the Court an electronic copy of the original e-mail from Ms. Iacono attached hereto as Exhibit 5.

*(cont'd)*

has other discrepancies with Mr. Dankert's October 5 letter in other respects, *e.g.*, the spacing and formatting of the heading, the listing of the road in Mr. Dankert's address ("E I70" in the Personal Finance Breakdown, "E1 70" in the October 5 letter).  (*Compare* Exhibit 4 *with* Exhibit 14.)[7]

117.    Further investigation has revealed similar lies in the past by Ms. Iacono about her purported ownership of the Rome Property.  For example, in a 2017 business credit application to JCAP, Ms. Iacono represented that she had owned the Rome Property since 2000.  As discussed above, this representation was false — Ms. Iacono has never owned the Rome Property.  Were it true (and it is not), then Ms. Iacono lied in her bankruptcy petition filed in the U.S. Bankruptcy Court for the District of Nevada, Case No. 07-17838.  In her November 27, 2007 Voluntary Petition (Doc. 1, "Petition"), she said (under penalty of perjury) that she had $0 in real property assets (Summary of Schedules, A – Real Property), and replied "None" to a request that she list "all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate" (Schedule A – Real Property).[8]

---

[7]    Mr. Dankert also said that he just does Dr. Dilley's taxes, indicating that he may not even have prepared the October 5 letter.  Red Fort's attorneys sent Mr. Dankert copies of both the Personal Finance Breakdown and October 5 letter, but it has been reported to Red Fort that Mr. Dankert has not looked at the documents because he was "scared" to do so.

[8]    In the same Petition, Ms. Iacono also replied "None" when asked to identify and provide information about any business in which, in the preceding six years, she was an "officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time" or in which she "owned 5 percent or more of the voting or equity securities[.]" (Petition, Statement of Financial Affairs, No. 18.)  This was patently false — for example, an Annual Report filed by Ms. Iacono with the Florida Department of Corporations on April 3, 2007 lists Ms. Iacono as the manager of Guardhouse Nevada (at the time based in Florida).

Ms. Iacono also said in the Petition that she had no interests in an IRA.  (Petition, Schedule B – Personal Property).  But in her Personal Finance Breakdown provided to Red Fort, she said she had $692,780 in a 401-K account.  The notion that Ms. Iacono accumulated that amount in

*(cont'd)*

**W.      Harm to Red Fort.**

118.     Under the Loan Agreement, Red Fort is entitled to immediate repayment of all amounts due.  This includes principal and interest, as well as Red Fort's various expenses including the significant amount of attorneys' fees incurred by Red Fort in its collection efforts, responding to the meritless Guardhouse Lawsuit, and commencing this litigation.  As of today's date, the amount due under the Loan Agreement is approximately $4 million.

119.     Apart from its claim under the Loan Agreement, Red Fort was fraudulently induced to enter that contract and thus part with €1.75 million in principal, plus incur significant expenses, based on the Guardhouse Defendants' wanton and criminal fraud and forgery activity.  This entitles Red Fort to compensatory and punitive damages, as well as statutory treble damages under the federal civil RICO statute.  Moreover, because much of the relevant fraudulent conduct took place in Indiana (where Dr. Dilley and Mr. Dankert reside), Red Fort is entitled to statutory treble damages under the Indiana Crime Victims' Compensation Act.

**COUNT ONE**
**Breach of the Loan Agreement**
*Against the Guardhouse Defendants*

120.     Red Fort repeats and realleges the foregoing paragraphs.

121.     The Loan Agreement is a valid and binding contract under New York law.  Red Fort and each of Defendants are parties to the Loan Agreement.

122.     Red Fort performed its obligations under the Loan Agreement.

---

a retirement account between 2007 and 2018 is wholly implausible.  The most obvious explanation for the discrepancy is that she either was lying in her bankruptcy petition or she was lying to Red Fort.

123.     In breach of the Loan Agreement, the Guardhouse Companies have failed to pay the amounts due thereunder.  In breach of the Loan Agreement and their obligations as guarantors thereunder, Ms. Iacono and Dr. Dilley have failed to pay the amounts due thereunder.

124.     As a result of Defendants' breaches, Red Fort has been damaged in an amount to be determined at trial.

**COUNT TWO**
**Fraud**
***Against the Guardhouse Defendants***

125.     Red Fort repeats and realleges the foregoing paragraphs.

126.     The Guardhouse Defendants, acting together and/or with each other's knowing agreement, approval and/or participation, represented to Red Fort that, among other things, the Guardhouse CEO owned the Rome Property (which property was allegedly worth €5.6 million). The Guardhouse Defendants also acted together and/or with each other's knowing agreement, approval, and/or participation to create and/or deliver to Red Fort false and forged documents purporting to evidence Ms. Iacono's ownership of the Rome Property.

127.     These representations were false — a different person owns the Rome Property — and the documents provided in connection therewith were forgeries.

128.     The Guardhouse Defendants, acting together and/or with each other's knowing agreement, approval and/or participation, represented to Red Fort that, among other things, the Guardhouse CEO had a net worth as reflected in the Personal Finance Breakdown for Ms. Iacono, dated August 21, 2018, purporting to be from Mr. Dankert.  The Guardhouse Defendants also acted together and/or with each other's knowing agreement, approval, and/or participation to create and/or deliver a false and forged document (*i.e.*, a Personal Finance Breakdown for Ms. Iacono) purporting to evidence Ms. Iacono's net worth.  The representations in that forged Personal

Finance Breakdown were false; Ms. Iacono did not have the net worth reflected in that forged document.

129.    The misrepresentations concerning the Rome Property and Ms. Iacono's purported net worth were material.

130.    The Guardhouse Defendants knew the falsity of these misrepresentations when made, and made them knowingly and intentionally in order to defraud Red Fort and to induce Red Fort into entering the Loan Agreement.

131.    Red Fort reasonably and justifiably relied on these misrepresentations in deciding to enter the Loan Agreement, and was induced to do so thereby.

132.    As a result of entering the Loan Agreement, Red Fort has been damaged in an amount to be determined at trial.

133.    The Guardhouse Defendants' fraud against Red Fort was gross, wanton, willful, morally culpable, egregious, and wantonly dishonest implying a criminal indifference to civil obligations.  The Guardhouse Defendants' fraud against Red Fort also was part of a pattern of fraud directed at the public generally.

**COUNT THREE**
**Violations of Civil RICO, 18 U.S.C. § 1962(c)**
***Against the Guardhouse Defendants***

134.    Red Fort repeats and realleges the foregoing paragraphs.

135.    The Guardhouse Companies, Ms. Iacono, and Dr. Dilley (the "Guardhouse Defendants") made up the "Guardhouse Enterprise," an association-in-fact that has engaged in, and whose activities affect, interstate commerce.

136.    The Guardhouse Enterprise was designed and operated by the Guardhouse Defendants as part of a fraudulent scheme to defraud lenders.   The idea and purpose of the

Guardhouse Enterprise is to approach various lenders on the pretext that the Guardhouse Companies are seeking financing in connection with supposed film studio development efforts in Scotland and Milan. The story they peddle is that a massive $400 million bond offering is just around the corner, and the companies need some short-term cash in the meantime. As security for the sought financing, they offer the L'Operateur Invoice as well as make various misrepresentations about their purported property ownership (both with respect to Ms. Iacono's alleged personal home in Rome and/or the supposed studio lands in Scotland and Milan). To make the deal more attractive, they highlight Dr. Dilley's personal wealth. If a lender falls for the scheme (as Red Fort did), the Guardhouse Defendants can walk away with the cash and the lender is left without recourse.

137. Ms. Iacono and Dr. Dilley were the principal creators of the Guardhouse Enterprise. Ms. Iacono founded the various Guardhouse Companies and acts as their CEO. Dr. Dilley acts as the principal funder of the enterprise. The Guardhouse Companies function as the front for this enterprise and are the purported "borrowers" in the fraudulent scheme. The Guardhouse Defendants operate the Guardhouse Enterprise without regard to corporate formalities (*e.g.*, by putting company assets in Ms. Iacono's personal Swiss bank account, and by Ms. Iacono and Dr. Dilley paying corporate expenses out of their own pocket).

138. All of the Guardhouse Defendants act in concert with, and at the direction of, each other, and are each other's agents. All of the Guardhouse Defendants are liable under 18 U.S.C. § 1962(d) for conspiring to violate 18 U.S.C. § 1962(c). Each of the Guardhouse Defendants has participated, directly or indirectly, in the conduct, management, or operation of the Guardhouse Enterprise through a pattern of racketeering activity with the meaning of 18 U.S.C. § 1961(5) and

18 U.S.C. § 1962(c).  The predicate acts making up the pattern of racketeering activity are discussed below.

139.    Beginning in about July 2018, in furtherance of their fraudulent scheme, the Guardhouse Defendants transmitted, or caused to be transmitted, or conspired to transmit, or aided and abetted the transmittal of, writings or signals by means of wire communications in interstate commerce.  As described in Paragraphs 53 to 67 and 108 to 117, these communications included the transmittal of a forged Personal Finance Breakdown for Ms. Iacono and a forged Italian property record, as well as numerous other communications representing that Ms. Iacono owned a €5.6 million property in Rome.  These numerous representations and forged documents were knowingly, intentionally, and willfully false, and were made in order to obtain money or property from Red Fort.  These repeated uses of the wires for the specific purpose of defrauding Red Fort violated 18 U.S.C. § 1343, and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

140.    During the same time period, the Guardhouse Defendants engaged in a similar fraudulent scheme to obtain money or property from other lenders, including one in Chicago, to whom the Guardhouse Defendants misrepresented their ownership of supposed studio properties in Scotland and Milan.  On information and belief, these fraudulent communications included the use of the wires in interstate commerce.

141.    On information and belief, the Guardhouse Defendants' efforts to obtain financing through their fraudulent scheme are ongoing with respect to other potential lenders.

142.    Red Fort detrimentally relied on the aforementioned false and fraudulent statements and forgeries that comprised the predicate acts of wire fraud in support of the Guardhouse Enterprise.  Based on these false and misleading statements and forgeries, Red Fort disbursed

€1.75 million to the Guardhouse Companies and incurred significant expenses in connection

therewith.  If Red Fort had known the truth (*i.e.*, that Ms. Iacono did not own the Rome Property

and that she did not have the net worth falsely represented in the forged Personal Finance

Breakdown), it never would have entered the Loan Agreement.  The Guardhouse Defendants'

actions in connection with operating or employing the Guardhouse Enterprise for its unlawful

purposes have caused Red Fort substantial damages.

143.    Red Fort was injured in its business or property by reason of the Guardhouse

Defendants' violations of 18 U.S.C. § 1962(c).  The injuries include, but are not limited to, the loss

of the loan proceeds and the various expenses in connection therewith.  The foregoing injuries

were the direct, proximate, and reasonably foreseeable consequence of the violations of 18 U.S.C.

§ 1962(c).  Red Fort was at least one of the direct targets and victims of the Guardhouse Enterprise.

As a result of the RICO violation, Red Fort has incurred damages in an amount to be determined

at trial.

144.    Pursuant to 18 U.S.C. § 1964(c), Red Fort also is entitled to recover treble damages,

plus costs and attorneys' fees from the Guardhouse Defendants.

## COUNT FOUR
### Violations of RICO, 18 U.S.C. § 1962(d)
#### *Against the Guardhouse Defendants*

145.    Red Fort repeats and realleges the foregoing paragraphs.

146.    The Guardhouse Enterprise is an enterprise engaged in and whose activities affect

interstate commerce.

147.    As set forth above, each of the Guardhouse Defendants agreed to and conspired to

violate 18 U.S.C. § 1962(c).  Specifically, the Guardhouse Defendants devised a scheme to defraud

and obtain money and property from Red Fort and other potential U.S. lenders by means of false

and fraudulent pretenses, representations, and promises made through the transmission of interstate wire communications.

148.    Each of the Guardhouse Defendants conspired to conduct and participate in the conduct of the affairs of the Guardhouse Enterprise through a pattern of racketeering activity, including wire fraud.  Each of the Guardhouse Defendants knew that their predicate acts were part of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

149.    As a direct and proximate result of the Guardhouse Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Red Fort was harmed as describe above.

150.    Pursuant to 18 U.S.C. § 1964(c), Red Fort also is entitled to recover treble damages, plus costs and attorneys' fees from the Guardhouse Defendants.

## COUNT FIVE
### Civil Remedy under Indiana Crime Victims' Compensation Act
#### *Against the Guardhouse Defendants*

151.    Red Fort repeats and realleges the foregoing paragraphs.

152.    The Indiana Crime Victims' Compensation Act ("ICVCA") provides that if a person suffers a "pecuniary loss as a result of a violation of IC 35-43" (which establishes various property crimes), the person "may bring a civil action against the person who caused the loss[.]"  Indiana Code § 34-24-3-1.

153.    The Guardhouse Defenants violated Indiana Code § 35-43-5-2 by knowingly and/or intentionally making a written instrument (*i.e.*, the "Personal Finance Breakdown for Surya G. Iacono," described at Paragraphs 57 to 59 and 116), and/or knowingly and intentionally agreeing to the making of that document or aiding and abetting the making of such document,

which was done in such a manner that the document purported to have been made by another person (*i.e.*, Mr. Dankert), at another time, with different provisions, or by authority of one who did not give authority (*i.e.*, Mr. Dankert).  This forgery was done as part of the Guardhouse Defendants' scheme to defraud Red Fort, which successfully induced Red Fort to give them €1.75 million plus incur significant additional expenses.

154.    The Guardhouse Defendants violated Indiana Code § 35-45-5-3 by knowingly and/or intentionally making a false or misleading written statement and/or knowingly and intentionally agreeing to the making of that statement and/or aiding and abetting the making of that statement (*i.e.*, the "Personal Finance Breakdown for Surya G. Iacono," described at Paragraphs 57 to 59 and 116) with the intent to obtain property from Red Fort.  This was done as part of the Guardhouse Defendants' scheme to defraud Red Fort, which successfully induced Red Fort to give them €1.75 million plus incur significant additional expenses.

155.    Accordingly, under the ICVCA, Red Fort is entitled to, among other things, treble damages, attorneys' fees, and all other expenses and costs of litigation and collection.

### COUNT SIX
### Violation of Indiana Bad-Check Statute
### *Against Dr. Dilley*

156.    Red Fort repeats and realleges the foregoing paragraphs.

157.    The Indiana Bad Check Statute provides that "a person found liable under other applicable law is liable [] to the holder of a check if the person executed and delivered the check to another person drawn or payable at a financial institution and the person . . . [w]ithout valid legal cause stops payment on the check."  Indiana Code § 26-2-7-4.

158.    Dr. Dilley executed and delivered to Red Fort a check (#3085) in the amount of $2,732,340, post-dated to January 15, 2019.  This check was provided in connection with and as

partial security for Dr. Dilley's personal guarantee obligations under the Loan Agreement.  Red Fort is a holder and a holder-in-due-course of that check.

159.    On or about January 14, 2019, Dr. Dilley stopped payment on the check without valid legal cause.

160.    Dr. Dilley has violated other applicable law by, among other things, breaching his contract obligations, defrauding Red Fort, and violating federal civil RICO law and Indiana criminal law.

161.    Accordingly, under the Indiana Bad Check Statute, Red Fort is entitled to, among other things, the face amount of the check, plus 18% annual interest on the face amount of the check, attorneys' fees, and all other expenses and costs of litigation and collection.

**COUNT SEVEN**
**Dishonor of a Check Under the U.C.C.**
***Against Dr. Dilley***

162.    Red Fort repeats and realleges the foregoing paragraphs.

163.    Dr. Dilley made out a personal check (#3085) to Red Fort, post-dated to January 15, 2019, in the amount of $2,732,340.  This check was a negotiable instruments under the Uniform Commercial Code ("U.C.C.").

164.    Red Fort is a holder and a holder-in-due-course of this check under the U.C.C.

165.    On or about January 14, 2019, Dr. Dilley stopped payment on the check.  This constituted a dishonor of the check under the U.C.C.

166.    As a result of Dr. Dilley's dishonor of the check, Red Fort has been damaged in an amount to be determined at trial.

## COUNT EIGHT
### Breach of Contract and Declaratory Judgment
### *Against L'Operateur, GM Group, and Ms. Iacono*

167.    Red Fort repeats and realleges the foregoing paragraphs.

168.    The L'Operateur Payment Agreement is a valid and binding contract under New York law.  Red Fort, L'Operateur, and Ms. Iacono are expressly parties to the L'Operateur Payment Agreement, and Red Fort is a beneficiary of the other parties' obligations to one another under that agreement.  GM Group also is party to the L'Operateur Payment Agreement in its capacity as L'Operateur's alter ego in the U.S., as described in Paragraph 32.

169.    Red Fort performed its obligations under the L'Operateur Payment Agreement.

170.    In breach of the L'Operateur Payment Agreement, L'Operateur and GM Group have failed to pay to Ms. Iacono (and/or Guardhouse) the amounts owed on the L'Operateur Invoice.

171.    As a result of L'Operateur's and GM Group's breach, Red Fort has been damaged in the amount of the invoice, plus interest, which is less than the amounts now owing under the Loan Agreement.   Because Red Fort is the direct and express beneficiary of the payment required to be made by L'Operateur (and GM Group) to Ms. Iacono, and Ms. Iacono is required under the L'Operateur Payment Agreement to transfer any monies received from L'Operateur to Red Fort, the Court should (i) declare that the L'Operateur Payment Agreement requires that L'Operateur must make a payment to Ms. Iacono in the amount of the invoice plus interest; (ii) declare that the L'Operateur Payment Agreement requires Ms. Iacono to pay all monies received from L'Operateur pursuant to the L'Operataeur Payment Agreement to Red Fort; and (iii) as a consequence, under the L'Operateur Payment Agreement, order that L'Operateur pay directly the amount of the invoice plust interest to Red Fort.

## REQUEST FOR RELIEF

WHEREFORE, Red Fort respectfully requests that this Court enter an order and judgment:

i.  Awarding compensatory damages to Red Fort;

ii.  Awarding punitive damages to Red Fort;

iii.  Awarding statutory treble damages, among other things, under 18 U.S.C. § 1964(c);

iv.  Awarding statutory treble damages, among other things, under the Indiana Crime Victim Compensation Act;

v.  Awarding pre- and post-judgment interest at the maximum lawful rate;

vi.  Awarding Red Fort attorneys' fees and other litigation expenses; and

vii.  Make the declarations set forth in Paragraph 171 of this Complaint;

viii.  Awarding such other relief as the Court deems just and proper.

Dated:   January 23, 2019
New York, New York.

CLIFFORD CHANCE US LLP


By:  _s/ Anthony M. Candido_____

Anthony M. Candido
John P. Alexander
31 West 52nd Sreet
New York, NY 10019

*Attorneys for Plaintiff Red Fort Capital, Inc.*

- 46 -