UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RED FORT CAPITAL, INC,

                Plaintiff,                      19 cv 686 (PKC)

     -against-                       OPINION
                                      AND ORDER

GUARDHOUSE PRODUCTIONS LLC et al.,

                Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Pending before the Court are plaintiff Red Fort Capital, Inc. ("Red Fort") and

defendants Russel Dilley and Surya Iacono's cross-motions to dismiss the Complaint and

Counterclaims and a motion for judgment on the pleadings with respect to Red Fort's breach of

contract claim. (Docs 73, 76.) For the foregoing reasons, the motions will be granted in part and

denied in part.

BACKGROUND

      I.    <u>Allegations in the Complaint</u>

        In 2018, Guardhouse Studios Management Limited, Guardhouse Studios Italy

S.R.L., and Guardhouse Studios Scotland Ltd. ("Guardhouse"), which are co-owned by Dilley

and Iacono (collectively, "Defendants"), sought to develop two full service television and studio

complexes in Milan, Italy and Edinburgh, Scotland. (Compl. ¶¶22, 27; Doc 5.) Defendants

claimed that they would finance the project with proceeds from a forthcoming $400 million bond

offering to be made in December 2018 with the help of the private equity firm SDI Capital. (<u>Id</u>.

¶¶ 30, 34.) Defendants engaged a commercial real estate loan broker, JCAP Global Co., to find a

party willing to extend bridge financing to Guardhouse in the interim period to cover expenses

and costs.  (Id.)  Guardhouse claimed it would repay any bridge financing with an outstanding invoice for €2,371,823 that they had issued in May 2018 to a French company, L'Operateur Partenaire Social ("L'Operateur") due on October 15, 2018. (Id. ¶¶31, 34.)  JCAP solicited Chris Messina at The Capital Group to find a lender. (Id. ¶36.)  Messina contacted plaintiff, Red Fort, a private equity firm that engages in large specialty finance projects.  (Id. ¶¶40, 44.)

Red Fort and Guardhouse executed a Letter of Intent on August 20, 2018. (Id. ¶¶47, 48.)  Red Fort sought additional guarantees for the loan.  Ms. Iacono provided Red Fort with a "Personal Finance Breakdown" from Dilley's personal accountant, Curtis W. Dankert, which stated that Dankert reviewed Iacono's assets and they included a home in Rome worth €5.6 million and an interest in an $8.7 million trust.  (Id. ¶57.)  Iacono provided an Italian property registry document confirming her ownership interest in the Rome property.  (Id. ¶60.) Iacono provided Red Fort with powers of attorney to authorize Red Fort to take a mortgage against her Rome property. (Id. ¶67.)  Red Fort asserts on information and belief that Iacono does not own the Rome Property and the documents showing Iacono's ownership of the Rome Property were forged by the Guardhouse Companies, Dilley, and Iacono. (Id. ¶¶58, 61.)  Dankert has confirmed that he did not prepare any financial statement for Iacono. (Id. ¶116.)

Dilley emailed a copy of a postdated personal check to Red Fort on October 7, 2018 providing security for his personal guarantee.  (Id. ¶¶74.)  On or about October 9, 2018, Dilley personally gave Red Fort's CEO, Parminder Singh, a second personal postdated check in the amount of $2,732,340 as partial security. (Id. ¶¶73-75.)  Red Fort also received confirmation from L'Operateur on October 8, 2018 that it would pay its amount due in the invoice directly to Red Fort on November 15, 2018. (Id. ¶¶76, 77.)

The parties finalized their loan agreement on either October 9 or 10, 2018 (the "Agreement").[1] (Id. ¶¶82-84.) Iacono signed a redline version of the Agreement on October 9 and initialed each page. (Id. ¶82.) The October 9 version contained a principal of €2,550,000 which included an initial disbursement of €1,750,000 and a fee of €500,000. (Id.) Red Fort sent an execution version to Iacono the next day containing identical disbursement amounts and Iacono signed the signature page and returned it to Messina. (Id. ¶83 and Ex. 6.) Messina sent it to Red Fort, who added the date, corrected the table of contents, and emailed a fully executed version back to Iacono. (Id. ¶83 and Ex. 7.) Iacono was named as a guarantor. (Doc 5-7 (Execution Version); Preamble.) Dilley acceded to the Agreement as a guarantor by Letter of Accession as required pursuant to Section 3.1(j) of the Agreement. (Compl. ¶84; see Doc 85-10 (Dilley Accession Letter).) Guardhouse was required to direct L'Operateur to pay Red Fort proceeds from its invoice directly. (Compl. ¶91 (citing Agreement § 2.1(d), 3.1(i).) The loan's maturity date was January 15, 2019. (Compl. ¶87.) The Agreement further stated that "[i]n the event Borrowers fail to repay the outstanding principal of the Loan by November 15, 2018, interest thereon or any other amounts due" shall accrue at a first extension rate of 2.00% per month. (Agreement, Ex. 7 § 1.3(b)). On October 10, Red Fort disbursed €1,750,000 to Guardhouse. (Compl. ¶93.)

L'Operateur worried about taxes associated with directly repaying Red Fort, a company located outside of the European Union. (Id. ¶96.) On November 7, 2018, to address L'Operateur's concerns, L'Operateur, Red Fort, and Iacono entered into a separate agreement ("L'Operateur Separate Agreement") (Doc 5 Ex. 9.) The L'Operateur Separate Agreement

---

[1] There are two versions of the Agreement relevant to this dispute, one signed by Guardhouse on October 9 and one signed by Red Fort on October 10. (See Doc 65 Ex.C; Doc 5 Ex. 7.) As will be seen, any differences between the two versions of the Agreement are immaterial to the present dispute and hence both are referred to as the Agreement.

expressly incorporated the Loan Agreement of October 10, 2018. (<u>Id</u>.)  The Separate Agreement stated that, "[n]otwithstanding any prior arrangements," by November 9, 20[1]8,[2] L'Operateur "shall pay . . . to Ms. Iacono the entire outstanding balance under the Receivable [the invoice]," and "Ms. Iacono shall, upon receipt of funds . . . transfer all such funds to an account designated by Red Fort." (<u>Id</u>. ¶97 & Ex. 9).

On November 15, L'Operateur wrote that it was facing "administrative and fiscal constraints" due to France being "blocked by social movements" and asked for more time to repay the invoice. (<u>Id</u>. ¶98.)  On December 4, 2018, Red Fort informed Dilley and Iacono that increased interest rates in the Agreement were triggered by L'Operateur's failure to meets its repayment obligation by November 15, 2018. (<u>Id</u>. ¶99; <u>see</u> Ex. 7 § 1.3(b).)  A week later, Red Fort again emailed Dilley and Iacono listing amounts due.  (Compl. ¶100.)  The same day, Guardhouse commenced a lawsuit against Red Fort in the New York Supreme Court for New York County alleging invalidity and breach of the Agreement and seeking a temporary restraining order and preliminary injunction.  (<u>Id</u>. ¶¶101-02.)  After Guardhouse filed suit, Red Fort declared an Event of Default under the Agreement and demanded immediate repayment of all amounts due. (<u>Id</u>. ¶106.)  Guardhouse's attorneys stopped payment on Mr. Dilley's check one day before it came due (<u>id</u>. ¶107), and Guardhouse learned from an Italian notary public that Iacono is not listed as an owner on the Rome property in the Italian land registry (<u>id</u>. ¶113.  To date Red Fort has not received repayment of any amount due. (<u>Id</u>. ¶106.)

II.     <u>Allegations in the Counterclaims</u>

Guardhouse alleges that, while at all times unrepresented by counsel, the companies were induced by Red Fort to enter into an outrageous and one-sided unconscionable loan agreement (Counterclaims ¶¶1-3; Doc 65.)  Iacono signed a version of the Agreement and

---

[2] The date appears as 2008 but the parties do not dispute it was intended to refer to 2018.

then was asked to sign the signature page four additional times without receiving full versions of the updated contract. (Id. ¶32.) Iacono does not recall having signed the October 10 version of the Agreement. (Id. ¶33.) Iacono believed she was entering a factoring agreement, not a loan. (Id. ¶37.)

LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint or counterclaim "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted). A court must disregard legal conclusions, which are not entitled to the presumption of truth and instead examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant. In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff[s'] claims are barred as a matter of law.'" Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208−09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

The Complaint alleges breach of contract, common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and violations of

Indiana state law against Guardhouse, Iacono, Dilley, and others. The Guardhouse entities have counterclaimed alleging fraudulent inducement, procedural and substantive unconscionability, breach of contract, breach of the implied covenant of good faith and fair dealing, and forgery.

Red Fort has filed a motion to dismiss all counterclaims and enter judgment on the pleadings as to Count 1, its claim for breach of contract, against Guardhouse. Iacono and Dilley have filed a motion to dismiss all claims in the Complaint against them.

Both parties brief all claims under New York law. Such "implied consent . . is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (omission in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).[3]

The Court considers Iacono and Dilley's motions first.

I. Iacono and Dilley's Motions to Dismiss

Red Fort maintains that under Rule 12(g), Fed. R. Civ. P., Dilley cannot bring a 12(b)(6) motion because he has already brought a Rule 12 motion to dismiss for lack of subject matter jurisdiction which the Court has dismissed. (See Minute Entry for Mar. 29, 2019; Doc 72.) "[T]he defense of failure to state a claim is not waivable." Patel v. Contemporary Classic of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001); see Wright & Miller, Fed. Prac. and Proc. § 1361 (5th ed. 2007) (noting that Rule 12(g)'s waiver "does not apply to defenses under Rule[] . . . 12(b)(6)."). "[T]o the extent that [Dilley]'s motion is brought pursuant to Rule 12(b)(6), it shall be construed as a motion for judgment on the pleadings under Rule 12(c), and is not barred by Rule 12(g)." Iconix Brand Grp., Inc. v. Bongo Apparel, Inc., 06 cv 8195 (DLC), 2008 WL 2695090, at *2 n.6 (S.D.N.Y. July 8, 2008).

---

[3] The October 9 and October 10 versions of the Agreement both further state that "[t]he laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement." (Doc 5 Ex. 7 & Doc 65 Ex. C § 9.17(a).)

A.  RICO claims (Counts 3, 4)

To state a claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must plead "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." Anatian v. Coutts Bank Ltd., 193 F.3d 85, 88 (2d Cir. 1999) (quotations omitted). Additionally, a plaintiff must allege that the enterprise is engaged in, or the activities of the enterprise affect, interstate or foreign commerce. 18 U.S.C. § 1962(c). Section 1962(d) prohibits any person from "conspir[ing]" to violate the provisions of section 1962(c). "RICO plaintiffs may satisfy this element by showing only a minimal effect on interstate commerce." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 n.12 (2d Cir. 2004) (quotations omitted). Dilley and Iacono ask the Court to dismiss RICO claims against them because they claim Red Fort has not alleged facts giving rise to a plausible inference of (1) an enterprise with Dilley or Iacono's participation that (2) engaged in a pattern of racketeering activity.

Iacono and Dilley argue the Complaint does not allege Iacono, Dilley, and the Guardhouse companies acted as an enterprise. An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). According to Iacono and Dilley, Dilley did not contribute at all to the scheme, and without Dilley, Iacono is not distinct enough from the Guardhouse companies to be considered an enterprise.

The definition of an enterprise is "obviously broad . . . . The term 'any' ensures that the definition has wide reach." Boyle v. United States, 556 U.S. 938, 944 (2009); see Automated Teller Mach. Advantage LLC v. Moore, 08 cv 3340 (RMB)(FM), 2009 WL 2431513, at *6 (S.D.N.Y. Aug. 6, 2009) (Boyle "establishes a low threshold for pleading [an association-in-fact] enterprise"). RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583

(1981). A plaintiff claiming RICO violations need only allege that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs," or that an individual "participate[d] in the operation or management of the enterprise itself." <u>Azirelli v. Cohen Law Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994).

The Complaint alleges that Dilley "designed and operated" the Guardhouse Enterprise (Compl. ¶136), "acted together" with Iacono to forge Surya's Personal Finance Breakdown (<u>id</u>. ¶58) and "knowing[ly] agree[d], approv[ed], and/or participat[ed]" with Iacono to forge the Rome Property record (<u>id</u>. ¶¶61-62.) Dilley himself in a declaration submitted with his motion admits to "agree[ing]" with Iacono, his business partner and co-owner of Guardhouse, to look for bridge loan financing and "enter into another agreement" with Red Fort. (Doc 78 ¶¶5, 22.) These facts are sufficient to create a plausible inference that Dilley participated in the operation and management of the alleged RICO enterprise, that he exercised some degree of control over it, and that he knew of its allegedly fraudulent objective. <u>See</u> <u>Martin Hilti Family Trust v. Knoedler Gallery, LLC</u>, 137 F. Supp. 3d 430, 478-79 (S.D.N.Y. 2015). Because Dilley is plausibly alleged to be part of the RICO enterprise, the Court need not determine whether an entity alleging only Iacono and the Guardhouse entities would alone constitute an "enterprise."

Iacono and Dilley assert Red Fort has not alleged a "pattern" of activity. "A RICO plaintiff must . . . show a 'pattern of racketeering activity' based upon the occurrence of at least two predicate acts within a ten-year period." <u>Id</u>. at 478 (quoting 18 U.S.C. § 1961(5)). The predicate acts must be "related" and "amount to or pose a threat of continued criminal activity." <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).

Red Fort has not alleged a pattern of activity. Contrary to Iacono and Dilley's argument, Red Fort has alleged the occurrence of at least predicate acts that are related.

Predicate acts include "any act which is indictable under . . . section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). Wire fraud requires a showing that someone "transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing [a] scheme or artifice" to defraud. 18 U.S.C. § 1343. "[T]o establish a scheme to defraud for purposes of the wire fraud statute," it does not need to be shown "that the scheme in fact resulted or would have resulted in a loss to the person who is the target of the plan." United States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000).

Red Fort alleges Iacono and Dilley engaged in a scheme to defraud lenders by misrepresenting the L'Operateur invoice as security for "short-term cash." (Compl. ¶136; see id. ¶¶134-40 (discussing the fraudulent scheme alleged in Count 3)). Red Fort alleges the same scheme was attempted with Red Fort and an unidentified potential lender in Chicago. (Compl. ¶¶70-71; see id. ¶140.) Allegations related to the Chicago lender are that Iacono "made various representations that Guardhouse" owned land in Scotland and Milan "[i]n connection with" Guardhouse's application for project financing from the Chicago lender, that she "highlighted her connection with the personally wealthy Dr. Dilley," and that ultimately "the transaction fell apart when the Chicago firm learned that Guardhouse's representations of property ownership were false." (Id. ¶71; see id. ¶140.) Red Fort has alleged two related acts.

However, Red Fort's RICO claims will be dismissed because these predicate acts do not "amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239. Continuity refers to "a closed period of repeated conduct" (closed-ended continuity) or to "past conduct that by its nature projects into the future with a threat of repetition" (open-ended continuity). Id. at 241-42. "RICO claims premised on mail or wire fraud must be particularly scrutinized" for continued conduct "because of the relative ease with which a plaintiff may mold

a RICO pattern from allegations that, upon closer scrutiny, do not support it." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (quotations and citation omitted).

The acts here spanned from July 2018 until sometime in October 2018. (See, e.g., Compl. ¶¶33 n.2, 79, 139-40 (cataloguing discussions with Red Fort and the Chicago lender)). Predicate acts that span "less than one year" cover "a period of insufficient length to demonstrate closed-ended continuity under [Second Circuit] precedents." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999) (citing GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 467-69 (2d Cir. 1995)); see Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017) (phone calls separated by a few months insufficient to support closed-ended continuity).

The nature of the two alleged acts of wire fraud do not support an inference of open-ended continuity. Schemes that are "inherently terminable" do not imply a threat of ongoing racketeering activity. Cofacredit, 187 F.3d at 244. The fraudulent acts alleged here are Guardhouse's attempts to secure bridge financing until the proceeds of a December 2018 bond offering were received. Guardhouse has received its bridge loan from Red Fort and the date by which the bridge loan was to be replaced by the proceeds of a bond offering passed before the filing of the Complaint. Given the public nature of the present suit, any claim that the bond offering will be revived and will be fraudulent is speculative. "The nature of the predicate acts themselves" and their circumstances implies that the scheme has "come to its conclusion." Id.; see GICC Capital, 67 F.3d at 466 (finding scheme inherently terminable where there were no assets left to gain in fraudulent scheme); Jus Punjabi, LLC v. Get Punjabi Inc., 14 cv 318 (GHW), 2015 WL 2400182, at *10 (S.D.N.Y. May 20, 2015), aff'd, 640 F. App'x 56 (2d Cir. 2016) (finding no open-ended continuity where plaintiffs alleged "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims" (internal quotations omitted)).

Red Fort's RICO claim will be dismissed. Because Red Fort has not plead a substantive violation of RICO in Count 3, Red Fort's RICO conspiracy claim (Count 4) will also be dismissed. <u>Reich</u>, 858 F.3d at 62 (citing <u>First Capital Asset Mgmt.</u>, 385 F.3d at 182).

B. <u>Fraud (Count 2)</u>

Red Fort's fraud claim alleges that the Guardhouse defendants misrepresented their assets and forged documents to induce Red Fort to enter the Agreement.

Dilley challenges Red Fort's assertion of scienter. A party may plead scienter by "alleging facts to show that defendant[] had both motive and opportunity to commit fraud" or facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000). The Complaint adequately pleads Dilley had motive and opportunity to commit fraud. He is alleged to have been co-owner and the primary funder of Guardhouse. (Compl. ¶¶3, 26.) He personally guaranteed $2,732,340 of the loan and to date has not repaid any portion of it or explained reasons for his failure to repay. (<u>Id</u>. ¶¶5, 106.) He cancelled a personal check guaranteeing the loan the day before it came due with no explanation. (<u>Id</u>. ¶¶107, 159.) On these facts alone Red Fort has alleged he had motive and opportunity to commit fraud.

Iacono and Dilley argue the fraud claim should be dismissed because it is duplicative of Red Fort's breach of contract claim. Collateral misrepresentations that lead to the formation of a contract, as alleged here, may give rise to fraud claims separate from breach of contract claims. <u>Cohen v. Koenig</u>, 25 F.3d 1168, 1173 (2d Cir. 1994) ("[A]lthough a plaintiff is not allowed to 'dress up' a breach-of-contract claim as a fraud claim, a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced [a party] to enter the contract.").

C.  Breach of Loan Agreement (Count 1)

Iacono and Dilley argue that Red Fort's claim for breach should be dismissed because Red Fort anticipatorily repudiated the loan agreement by demanding repayment before the maturity date of the loan.

Anticipatory breach, or repudiation, is an affirmative defense that may justify nonperformance under a contract.  Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463 (1988); see Am. List Corp. v. U.S. News and World Report, Inc., 75 N.Y.2d 38, 44 (1989).  Anticipatory breach requires a "positive and unequivocal" expression of intent to breach by the promisor "before the time for performance."  Princes Point LLC v. Muss Dev. L.L.C., 30 N.Y.3d 127, 133 (2017); see N.Y. UCC § 2-610 (requiring repudiation with respect to "performance not yet due").  The "unqualified and clear refusal to perform" must be "with respect to the entire contract."  O'Connor v. Sleasman, 830 N.Y.S.2d 377, 379 (2d Dep't 2007).  "The rationale behind the doctrine of anticipatory breach is that it gives the non-repudiating party an opportunity to treat the repudiation as an anticipatory breach without having to futilely tender performance or wait for the other party's time for performance to arrive."  Kaplan v. Madison Park Grp. Owners, LLC, 94 A.D.3d 616, 618-19 (1st Dep't 2012).

It is uncontested that Red Fort disbursed $1,982,271 to Guardhouse by depositing the funds in Guardhouse's co-founder Iacono's Swiss bank account.  (Compl. & Ans. ¶¶1, 94.)  At that point, Guardhouse does not assert that Red Fort had any remaining obligations to perform under the Agreement.  Where all that is left is "payment of money in the future, without surety or other conditions involved . . . decisions are in general accord that the doctrine of anticipatory breach has no application."  23 Williston on Contracts § 63:60 (4th ed.); see Am. List Corp., 75 N.Y.2d at 44 (anticipatory breach "inapplicable to contracts for the payment of money only" (citing Kelly v. Sec. Mut. Life Ins. Co., 186 N.Y. 16, 19 (1906))).  Red Fort could not have

refused to perform under the Agreement after disbursing the amount owed. Nothing Red Fort did after disbursement could be a "clear refusal to perform" part of the Agreement, let alone the "entire contract" as required by law for anticipatory breach. O'Connor, 830 N.Y.S.2d at 379.

Baseless accusations that a counter party has breached an agreement is not the equivalent of the accusing party's failure to perform its obligations under the entire contract. Red Fort promised to lend money to the Guardhouse entities, which was duly and timely transferred to them. An unwarranted demand for early repayment is not equivalent to a party's failure to perform under a contract. Guardhouse cites no case in which New York courts have upheld a claim for anticipatory repudiation based on early demand for repayment. If Guardhouse's theory were accepted, it would lead to the absurd result that a lender would be precluded forever from recouping the proceeds of a loan based upon a premature demand for repayment. New York law does not support such a result. Iacono and Dilley's motion to dismiss Count 1 of the Complaint will be denied.

D. Indiana Crime Victims' Compensation Act (Count 5)

The Indiana Crime Victims' Compensation Act ("ICVCA"), Ind. Code § 34-24-3-1, allows a person to recover for "a pecuniary loss as a result of a violation of" Ind. Code § 35-43-5-2, knowingly making a written instrument purported to have been made by another person, and Ind. Code § 35-43-5-3, knowingly making a false or misleading written statement with intent to obtain property. Red Fort alleges that Iacono and Dilley have violated Ind. Code § 35-43-5-2 and Ind. Code § 35-43-5-3 by knowingly writing or aiding and abetting in writing the Personal Finance Breakdown for Suraya G. Iacono and purporting the document was made by Dankert, Dilley's accountant, with intent to defraud Red Fort into giving Guardhouse the loan. (Compl. ¶¶153-54.)

Dilley and Iacono argue Count 5 should be dismissed because (1) there must be a "quasi-criminal finding" under Indiana law to collect under the ICVCA; (2) fraud against Dilley is not plead in accordance with Rule 9(b), Fed. R. Civ. P., for the same reasons as those stated with respect to the motion to dismiss the fraudulent inducement claim; and (3) there are insufficient ties to Indiana to hold Iacono or Dilley liable for a violation of Indiana law.

"A criminal conviction is not a condition precedent to recovery under [the ICVCA]." Klinker v. First Merchants Bank, N.A., 964 N.E. 2d 190, 193 (Ind. 2012). Claimant "merely must prove each element of the underlying crime by a preponderance of the evidence." Id. The Court has already determined that the Complaint alleges fraud on the part of Dilley with the requisite particularity under Rule 9(b), Fed. R. Civ. P.

However, Count 5 will be dismissed because the Complaint fails to allege that Dilley or Iacono may be convicted under Indiana law of the offense of forging the Iacono Personal Finance Breakdown. A person may be convicted under Indiana law of an offense if, among other reasons, the conduct that is an element of the offense occurs in Indiana or an overt act in furtherance of a conspiracy occurs in Indiana. Ind. Code § 35-41-1-1(b)(1), (3). Red Fort, in attempting to explain the territorial connection to Indiana, alleges new legal theories in its motion to dismiss that are not alleged in its Complaint. Specifically, Red Fort alleges that it meets the territorial nexus with Indiana for its ICVCA claim because on or about October 9, 2018, Dilley met Singh in Indiana and at that meeting, Dilley tendered a check pursuant to a different forged letter (Doc 84 at 21.) The Complaint only alleges that the drafting of Iacono's Personal Finance Breakdown was a violation of the ICVCA. (Compl. ¶¶151-55.) "A plaintiff . . . is not permitted to interpose . . . a new legal theory in opposing a motion to

dismiss . . . ." <u>Uddoh v. United Healthcare</u>, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017); <u>see</u> <u>K.D.</u> <u>ex rel. Duncan v. White Plains Sch. Dist.</u>, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013) (similar).

Red Fort further argues in its opposition brief that "Indiana criminal law also applies to the forgery of the Dankert letters by Dilley in Indiana and/or the conspiracy to do so, agreed to by him in Indiana." (Doc 84 at 21.) But the Complaint does not allege that the drafting of Iacono's Personal Finance Breakdown, to the extent this is considered part of the "Dankert letters," occurred in Indiana. It states only that "Guardhouse Defendants acted together . . . to list Ms. Iacono's purported assets on Mr. Dankert's letterhead and fraudulently affix Mr. Dankert's signature thereto." (Compl. ¶58.) It does not allege Dilley or Iacono were in Indiana at the time the Breakdown was drafted or conceived. Because the Complaint makes no allegations that any relevant conduct on the part of Iacono or Dilley in relation to forging the Personal Finance Breakdown occurred in Indiana, they may not be found to have violated Ind. Code § 35-43-5-2 or Ind. Code § 35-43-5-3, violations of which are required for Red Fort to recover under the ICVCA. Dilley and Iacono's motion to dismiss Count 5 will be granted.

### E.  Indiana Bad Check Statute Against Dilley (Count 6)

The Indiana Bad Check Statute provides that "a person found liable under other applicable law is liable [] to the holder of a check if the person executed and delivered the check to another person drawn on or payable at a financial institution and the person . . [w]ithout valid legal cause stops payment on the check." Ind. Code § 26-2-7-4. Red Fort contends that Dilley violated Indiana's Bad Check Statute when he executed a check in the amount of $2,732,340 as partial security for his personal guarantee on the loan, gave the check to Singh while in Indiana, and, on or about January 14, 2019, stopped payment on the check without valid legal cause. (Compl. ¶¶75, 158-59.)

Dilley argues Count 6 should be dismissed because Red Fort fails to allege Dilley has been found liable under "other applicable law" as required. But Dilley concedes that "other applicable law" may include Red Fort's claim for fraud (Doc 77 at 22), which the Court has found to be plausibly pleaded. Accordingly, the Court will not dismiss Count 6.

    F.   <u>Dishonor of Check Under the Uniform Commercial Code Against Dilley (Count 7)</u>

Red Fort contends Dilley also violated the Uniform Commercial Code ("UCC") by stopping payment on his check. (Compl. ¶¶162-66.) Dilley asks the Court to dismiss Count 7 because it fails to specify which state's commercial code (Indiana or New York) Dilley allegedly violated and fails to specify a section of the UCC.

Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." <u>Johnson v. City of Shelby, Miss.</u>, 547 U.S. 10, 10 (2014); <u>see</u> <u>id.</u> (holding failure to invoke § 1983 did not require dismissal of the complaint); <u>Bristol-Meyers Squibb Co. v. Matrix Labs. Ltd.</u>, 655 F. App'x 9, 11 (2d Cir. 2016) (applying <u>Johnson</u>); 5 C. Wright & A. Miller, Fed. Prac. And Proc. § 1219, at 277-78 ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."). The Court is concerned with the adequacy of factual allegations in a complaint at the motion to dismiss stage. A party is "not require[d]" to "identify the substantive legal basis for its claim" on a motion to dismiss. <u>Bristol-Meyers Squibb</u>, 655 F. App'x at 11-12. Were there any doubt here, Red Fort has stated in its Opposition Brief that it is pleading UCC violations under Indiana Code § 26-1-3.1-502(b)(3). (Doc 84 at 24.) Dilley's motion to dismiss Count 7 will be denied.

G. Insufficient Service of Process on Iacono

Rule 12(b)(5), Fed. R. Civ. P., states that "a complaint may be dismissed for insufficient service of process." On a Rule 12(b)(5) motion, "plaintiff bears the burden of establishing that service was sufficient." Khan v. Khan, 360 F. App'x 202, 203 (2d Cir. 2010).

The parties agreed to methods of service of process to be valid and effective as stated in the Loan Agreement. "Such agreements are permissible and upheld by courts in the event of litigation." Greystone CDE, LLC v. Sante Fe Pointe L.P., 07 cv 8377 (RPP), 2007 WL 4230770, at *3 (S.D.N.Y. Nov. 30, 2007). "[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 315-16 (1964); see 4 Fed. Prac. & Proc. Civ. § 1062 (4th ed.) ("[A] person or an entity can consent to receive service of process in a manner that deviates from Rule 4 . . . . Indeed it is common practice in many commercial contexts for the parties to incorporate service provisions into their contracts.").

In Section 9.17 of the Agreement, the parties agreed that service of process by registered mail "in the manner provided for notices in Section 9.2 shall be effective service of process." Section 9.2 contains three sub sections, two of which are relevant here. Section 9.2(a) states that notices "shall be given in writing" and "addressed to the applicable address . . . as set forth on the applicable signature page." Section 9.2(b) states that all communications described in clause(a) shall be effective "if delivered by mail . . . when received by the intended recipient."

Red Fort attempted to effectuate service of process on Iacono via mail on February 8, 2019 to Iacono's address listed on the signature pages to the Agreement. (Doc 38.) The package was returned not delivered. (Candido Ex. 11; Doc 85.) Red Fort did not properly

effectuate service under the provisions designated in the Agreement. However, ineffective service was a result of Iacono failing to update Red Fort with a new mailing or forwarding address. Where service is to be effectuated by means of a contractual provision, an individual "will not be permitted to take advantage of his own wrong, and to escape liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." In re Bankers Trust Co., 450 F.3d 121, 127 (2d Cir. 2006) (quoting Spanos v. Skouras Theatres Corp., 364 F.2d 161, 169 (2d Cir. 1966) (en banc)). It was a condition of the Agreement that service could be effectuated based on the address provided by Iacono on the signature page. There is no dispute that she received actual and timely notice of the filing of the action against her. Her failure to update her address to allow Red Fort to abide by its service obligations will not form the basis for dismissal of this suit.

### H. Declaratory Judgment Against Iacono (Count 8)

Count 8 of Red Fort's complaint is primarily directed against L'Operateur. (See Compl. ¶¶168-71.) However, relevant here, Red Fort asks for a declaratory judgment against Iacono declaring that Iacono is required under L'Operateur Separate Agreement to transfer any monies received from L'Operateur to Red Fort. (Id. ¶171.) Iacono argues this count is insufficiently plead because a condition precedent of Red Fort's request is that L'Operateur have paid Iacono, which has not yet occurred. According to Iacono, the Court may not direct her to transfer money she does not have. In support of her argument, Iacono offers the Court Rule 9(c), Fed. R. Civ. P., which states that "when denying that a condition precedent has occurred or been performed, a party must do so with particularity." This does not prohibit claims in which a condition precedent has not yet occurred. Claims for declaratory judgment may be brought so long as there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland

Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941). Declaratory judgment actions may be brought even in cases where the underlying breach itself has not yet occurred. Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003). Red Fort's claim for declaratory judgment against Iacono in Count 8 may proceed.

II. Red Fort's Motions Directed to the Counterclaims

    A. Fraudulent Inducement (Count 1)

Red Fort moves to dismiss Count 1 of the Counterclaims purporting to assert a claim for fraudulent inducement. Fraudulent inducement under New York law requires proof of "(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cir. 2005). Fraudulent inducement must be plead with particularity under Rule 9(b), Fed. R. Civ. P. Id.

Guardhouse does not assert a plausible claim for fraudulent inducement. Guardhouse asserts that Red Fort underrepresented the principal amount of the loan. Iacono allegedly requested €2,371,823 at most, the value of the outstanding L'Operateur invoice, and understood this to be the value of the loan based on Red Fort's "verbal representations." (Counterclaim ¶57; Doc 65.) The Agreement instead has a principal of €2,550,000.

The alleged fraud is not plead with particularity. Guardhouse offers no details as to when Red Fort represented the loan amount would be for €2,371,823 or why that information was untrue at the time it was offered. Aetna, 404 F.3d at 580. Guardhouse admits in its Counterclaims that it "entered into a Loan, Security and Guaranty Agreement" with Red Fort on October 9, 2018 (Doc 65 ¶28; see id. ¶¶32, 33.) This version of the Agreement is attached to the Counterclaims (Doc 65) as Exhibit C. It states that the amount of the loan is for €2,550,000.

Guardhouse asserts that Red Fort did not fulfill its requirements under the Loan Agreement because Red Fort only distributed €1,716,068, not the €2,550,000 promised. (<u>Id</u>. ¶58.) Guardhouse has made no allegation it relied on a principal of €2,550,000 and has instead repeatedly claimed that it was not aware the principal was for this amount. (<u>See</u>, <u>e.g.</u>, <u>id</u>. ¶35.) It has further made no allegation that it was injured by the lack of additional disbursement or that it asked to receive any additional monies and was denied them. This basis for fraud is not plead with particularity.

Guardhouse asserts that it was under the impression the contract was a factoring of the invoice and not a loan. (<u>Id</u>. ¶55.) Its pleading directly contradicts this assertion. Guardhouse states that "notwithstanding that the parties agreed to structure the loan as a pure factoring agreement," "Red Fort demanded Ms. Iacono to act as the guarantor for the re-payment of the loan." (<u>Id</u>. ¶21.) It admits that it was told the Agreement was to be a loan that required a guarantor. It admits that Iacono gave power of attorney to Red Fort and that Iacono knew that Red Fort demanded Dilley personally guarantee "the loan agreement" as well (<u>Id</u>. ¶¶22-25.) Guardhouse cannot have it both ways. It has not asserted a plausible claim for fraudulent inducement.

B. <u>Forgery (Count 6)</u>

Guardhouse alleges that Red Fort replaced Guardhouse's signature on an October 9, 2018 version of the Agreement onto an October 10 version without Guardhouse's consent. (<u>Id</u>. ¶88; <u>see</u> <u>id</u>. ¶ 32 ("As of today, Ms. Iacono recalls having signed a version of the Loan Agreement dated October 9, 2018. However, Mr. Singh and [Red Fort] continuously present an agreement dated October 10, 2018, which Ms. Iacono does not recall having signed.").) Allegations that one party "secretly substituted one type of document for another," or

"forged . . . signatures," "go to the initial validity of the agreements." <u>Schaeffer v. Kessler</u>, 12 cv 8576 (PKC), 2013 WL 1155587, at *7 (S.D.N.Y. Mar. 20, 2013).  The claim is construed as one for fraud in the execution, which "occurs where there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a reasonable opportunity to know of its character or essential terms." <u>Del Turco v. Speedwell Designs</u>, 623 F. Supp. 2d 319, 335-36 (E.D.N.Y. 2009) (internal quotation marks and citation omitted). "Examples of fraud in the execution include a party's substitution of one type of document for another, and the substitution of a new document of the same kind as the one previously read and agreed to by the other party, but containing materially different terms." <u>Id</u>. at 336.  Fraud in the execution must be pleaded with particularity under Rule 9(b), Fed. R. Civ. P.  <u>Schaeffer</u>, 2013 WL 1155587, at *9.

Guardhouse fails to plausibly allege a claim for forgery or fraud in the execution. First, Guardhouse makes no argument to dispute Red Fort's motion to dismiss the forgery claim and accordingly, "it has conceded the point by silence."  <u>In re UBS AG Sec. Litig.</u>, 07 cv 11225 (RJS), 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28, 2012); <u>see</u> <u>In re Kingate Mgmt. Ltd. Litig.</u>, 746 F. App'x 40, 43 (2d Cir. 2018).  Even if not waived, Guardhouse has not pleaded its claim with particularity.  It makes no allegations as to when the signature was replaced, who replaced the signature, or what the fraudulent intent behind replacing a signature would be. Guardhouse admits that Iacono signed the version of the agreement on October 9, 2018 (Doc 65 ¶28 & Ex. C.)  That Agreement has as the principal amount of €2,550,000, the only material term of the October 10 Agreement that Guardhouse now disputes.  (Ex. C at 7; Doc 65.)  Guardhouse makes no additional allegations as to any material differences between the October 9 and October 10 versions of the Agreement that would plausibly allege a fraud in the execution claim.

C.  Procedural Unconscionability (Count 2)

"Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quotation marks and citations omitted); see Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made," which means a showing of "absence of meaningful choice on the part of the parties together with contract terms which are unreasonably favorable to the other party."  Gillman, 73 N.Y.2d at 10 (internal quotation marks and citation omitted).

Red Fort argues the unconscionability causes of action may be dismissed because unconscionability under New York law may only be raised as an affirmative defense.  This appears to be an open question.  Compare Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 285 (S.D.N.Y. 2017) (citing cases stating unconscionability is an affirmative defense), with Mayaguez S.A. v. Citigroup, Inc., 16 cv 6788 (PGG), 2018 WL 1587597, at *11-15 (S.D.N.Y. Mar. 28, 2018) (considering cause of action for unconscionability).  The Court need not decide this issue.  Guardhouse separately raises unconscionability as an affirmative defense to Red Fort's breach of contract claim.  (See Opp. Br. at 10; Doc 82.)  The Court will consider the arguments.

Guardhouse argues the contract is procedurally unconscionable based on the "complex nature of the document, Guardhouse Companies['] lack of counsel, [Red Fort]'s high pressure tactics, and the deceptive way in which [Red Fort] had Guardhouse Companies sign the document." (Doc 65 ¶63.)  But New York courts have found no procedural unconscionability

exists where "the party complaining is commercially sophisticated" and "where the complaining party had the option of engaging in business with another company or individual besides the defendant before signing the contract." SOL Grp. Mktg. Co. v. Lines, 14 cv 9929 (SHS), 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016) (first citing Matter of Surrey Strathmore Corp. v. Dollar Sav. Bank of N.Y., 36 N.Y.2d 173, 178 (1975), then citing Finsel v. Wachala, 79 A.D.3d 1402, 140304 (3d Dep't 2010)).

 The Guardhouse Companies are sophisticated parties. They were engaged in negotiations with multiple parties to extend financing for a commercial venture and represented that they were simultaneously engaged in a multi-million dollar bond offering and owed a multi-million dollar invoice for services rendered. (Compl. & Ans. ¶¶27-31.) Guardhouse and Red Fort engaged in an arms-length business transaction. Despite Guardhouse's conclusory assertion that Iacono is not an expert in financing and loans (Doc 65 ¶66), and that Guardhouse did not have legal counsel for the transaction (id. ¶63), "[b]usiness entities negotiating in a commercial setting do not warrant any special solicitude as 'unsophisticated' parties simply because they are new to a particular industry and choose to forego representation by counsel," Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 138 n.6 (2d Cir. 2016). Guardhouse has further admitted that it consulted with Italian attorneys during the course of the negotiations that led to the Agreement. (Compl. & Ans. ¶64; see Opp. Br. at 7; Doc 82; Candido Declaration of Apr. 18, 2019 Ex. 6; Doc 75 (providing email correspondence from Iacono referring to an Italian lawyer).) Guardhouse admitted that it was considering a separate loan financing agreement with a Chicago firm but "wanted to close with [Red Fort]" because Iacono believed the deal would close faster and Iacono "said the companies were willing to pay Red Fort's expenses and fees for quick cash." (Compl. & Ans. ¶¶70-71.)

Guardhouse states in its Opposition Brief that Mr. Singh threatened to Iacono "if you use another attorney other than mine, I will not lend you the money." (Doc 82 at 6-7.) This allegation does not appear anywhere in the Counterclaims. (See Doc 65.) "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." Jordan v. Chase Manhattan Bank, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015). And as mentioned above, Iacono used an Italian attorney during the course of negotiations. This allegation is both improperly brought in an opposition brief and meritless.

Guardhouse alleges that Red Fort altered portions of the document to inflate the principal amount and add fees on the day of the execution of the October 9 version of the Agreement. (Doc 65 ¶67.) "[A] party who signs a contract is presumed to have read it." SOL Grp. Mktg., 2016 WL 205444, at *7. Guardhouse admits that Iacono signed the Agreement. (Id. ¶28; see Guardhouse's Opp. Br. at 7; Doc 82). It cannot now claim ignorance of the contract's terms as a reason for procedural unconscionability. It also alleges Iacono was only provided the last page of the agreement to sign and that she did not see the first pages to review (Doc 65 ¶72.) As discussed, the counterclaims do not plausibly allege that Iacono was an unsophisticated party or was coerced in any fashion to sign the last page of the document without reviewing the additional pages. Even if Iacono was unable to review part of the document, "it was incumbent upon [her] to either secure additional time in which to review those documents, or to refuse to sign." Republic Nat'l Bank v. Hales, 75 F. Supp. 2d 300, 314 (S.D.N.Y. 1999); see Marciano v. DCH Auto Grp., 14 F. Supp. 3d 322, 334 (S.D.N.Y. 2014) (stating generally a contract may only be void for misreading "where the signer is illiterate, or blind, or ignorant of the alien language of the writing") (internal quotation marks and citation omitted).

Guardhouse argues the contract was usurious on its face, citing a case interpreting New York's usury statute, N.Y. Gen. Obligations Law § 5-501(2). Guardhouse does not specify if it is arguing the Agreement is invalid based on New York's civil or criminal usury laws. Subject to exceptions not relevant here, New York's civil usury law expressly does not apply to loans made in the amount of $250,000 or more. See N.Y. Gen. Obligations Law § 5-501(6)(a); see also In re Venture Mortg. Fund, L.P., 282 F.3d 185, 189 (2d Cir. 2002). New York's criminal usury law, N.Y. Gen. Obligations Law § 5-501(6)(b), does not grant a private right of action. Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 146 (S.D.N.Y. 2017); see EMA Fin., LLC v. AIM Exploration, Inc., 18 cv 145 (ER), 2019 WL 689237, at *6 (S.D.N.Y. Feb. 19, 2019).

The claim for procedural unconscionability, Count 2 of the Counterclaims, will be dismissed.

D. Substantive Unconscionability (Count 3)

Because "generally the party seeking to void a provision must allege both procedural and substantive unconscionability," NML Capital v. Republic of Argentina, 621 F.3d 230, 237 (2d Cir. 2010), Guardhouse's failure to allege procedural unconscionability dooms its substantive unconscionability claim.

Even if the Court analyzed its substantive unconscionability arguments, it would determine that Guardhouse fails to allege the requirements for substantive unconscionability. Guardhouse alleges the terms of the loan were unreasonably favorable to Red Fort (Counterclaim ¶70). "Although there is no general test for measuring the reasonableness of a transaction, courts commonly find – on motions to dismiss – that allegations of substantive unconscionability are insufficient." Mayaguez, 2018 WL 1587597, at *17 (internal quotation marks, alterations, and

citation omitted). Here, the terms of the Agreement provided that Guardhouse would receive an initial disbursement of €1,750,000 plus initial fees of €500,000. (Compl. & Ans. ¶86.) Each borrower further undertook to repay all attorney costs incurred in connection with any proceedings related to loan or its underlying obligations. (Id. ¶92; Agreement § 9.4). Guardhouse admitted that Iacono "said the companies were willing to pay Red Fort's expenses and fees for quick cash because they were using the loan as a bridge to the $400 million bond offering; any such costs would be insignificant in the larger picture." (Compl. & Ans. ¶70). Simply because the terms are a "bad bargain" for Guardhouse does not mean they are "so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to their literal terms." Mayaguez, 2018 WL 1587597, at *17 (internal quotation marks, alterations, and citation omitted); see State v. Avco Fin. Serv. of New York Inc., 50 N.Y.2d 383, 389 (1980) (unconscionability "requires some showing of an absence of meaningful choice on the part of one of the parties" (quotations omitted)).

Count 3 of the Counterclaims, alleging substantive unconscionability, will be dismissed.

E. Breach of Contract (Count 4)

Guardhouse alleges that Red Fort breached the contract by placing the Agreement in default before the maturity date on the loan following L'Operateur's failure to repay its portion of the loan by November 15. (Counterclaim ¶¶74-80; Doc 65.)[4] Breach of contract under New York law requires a party to allege (1) the existence of an agreement, (2)

---

[4] Red Fort argues in its Reply that Guardhouse has waived its argument related to anticipatory breach by failing to discuss it in Guardhouse's Opposition Brief. (Reply at 5-6; Doc 90 (citing Chen v. 2425 Broadway Chao Restaurant, LLC, 16 cv 5735 (GHW), 2017 WL 2600051, at *8 (S.D.N.Y. June 15, 2017).) In its Opposition Brief, Guardhouse supports its breach of contract claim by stating that Red Fort's action "interfere[d] with Guardhouse's ability to pay [and] thus constitute an anticipatory repudiation by Red Fort." (Opp. Br. at 12; Doc 82.) Guardhouse further states that Red Fort anticipatorily repudiated in response to Red Fort's argument for judgment on the pleadings. (Id. at 10.) The Court does not consider Guardhouse to have waived its anticipatory breach argument.

adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

Guardhouse's argument hinges on its assertion that Red Fort anticipatorily repudiated the Agreement. It is undisputed that Guardhouse has not adequately performed under the contract because it has not repaid any amount of the loan. (Compl. & Ans. ¶106.) "A claimant's failure to plead the performance of its own contractual obligations is fatal to a breach of contract claim even if the other requisite elements are properly pleaded." Comfort Inn Oceanside v. Hertz Corp., 11 cv 1534 (JG)(JMA), 2011 WL 5238658, at *3 (E.D.N.Y. Nov. 1, 2011). Under New York law, Guardhouse's failure to adequately perform may be excused if it alleges Red Fort anticipatorily repudiated the Agreement. In re Food Mgmt. Grp., LLC, 372 B.R. 171, 191 (2007); see Bear, Stearns Funding, Inc. v. Interface-Grp.-Nevada, Inc., 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (It is a "fundamental principle of contract law that . . . the material breach of a contract by one party discharges the contractual obligations of the non-breaching party.").

For the reasons stated above, see supra Discussion Section I.C, the Court has determined as a matter of law that Guardhouse did not anticipatorily repudiate the Agreement. Guardhouse's breach of contract claim will be dismissed.[5]

_____

[5] Guardhouse also asserts new arguments in its opposition papers in support of its breach of contract claim and in opposition to Red Fort's motion for judgment on the pleadings. Namely, Guardhouse asserts that Red Fort's CEO sent a series of emails in January 2019 to SDI Capital, the company involved in the bond offering with Guardhouse, that resulted in SDI Capital suspending negotiations with Guardhouse and preventing Guardhouse from repaying its loan. (Doc 82 at 8-13.) There are no allegations about Singh's email communications with SDI Capital in Guardhouse's Counterclaims; they are asserted only in the Third Party Complaint against Mr. Singh. (Third Party Compl. ¶¶47, 48, Ex. H; Doc 65.) These arguments are improperly advanced in Guardhouse's opposition brief. See Jordan, 91 F. Supp. 3d at 500.

F. Breach of Implied Covenant of Good Faith and Fair Dealing (Count 5)

Guardhouse's separate breach of implied covenant of good faith and fair dealing claim is dismissed as duplicative of its breach of contract claim. "[A] party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." Deutsche Bank Sec. Inc. v. Rhodes, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008). Guardhouse's breach of the implied covenant claim alleges that Red Fort breached an implied covenant by "refus[ing] to find an accord or provide Guardhouse Companies with any reasonable method of recourse" and by "[r]efus[ing] . . . to honor their obligations." (Doc 65 ¶¶84-85.) The express breach of contract claim states in relevant part that Red Fort refused to provide notice or "any recourse or remedy for Guardhouse Companies to pursue," and "deprived" Guardhouse of "the benefits of its agreement." (Id. ¶¶78-79.) The conduct alleged in both claims is the same and warrants dismissal of the breach of the implied covenant of good faith and fair dealing claim.

G. Motion for Judgment on the Pleadings for Count One of Red Fort's Complaint against the Guardhouse Entities (Alleging Breach of Contract)

Red Fort asks for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., as to Count 1 of the Complaint, which alleges breach of the Agreement against Guardhouse (Doc 5 ¶¶7, 120-24.)

A Rule 12(c) motion should be granted if "no material issue of fact remains to be resolved" and the moving party is "entitled to judgment as a matter of law." Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990). The movant bears the burden of establishing that it is entitled to judgment on the pleadings. Id. "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842

F.2d 639, 642 (2d Cir. 1988) (citation omitted). On a 12(c) motion, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 647 F.3d 419, 422 (2d Cir. 2011) (quotations omitted).

As stated above, breach of contract under New York law requires a party to demonstrate (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. <u>Harsco Corp.</u>, 91 F.3d at 348.

Red Fort's motion for judgment on the pleadings will be granted. The parties entered into an agreement. Guardhouse denies that it signed the October 10 version of the Agreement. (Compl. & Ans. ¶84; <u>see</u> Doc 5-7 (Execution Version of the Agreement dated October 10, 2018).) However, Guardhouse admits that it signed the October 9 version of the Agreement and attaches a copy of that version of the Agreement to its Answer and Counterclaims. (Compl. & Ans. ¶82; Counterclaims ¶28; Doc 65 Ex. C (October 9 Version of the Agreement).)[6] The October 9 version is not signed by Red Fort. (Doc 65 Ex. C.) "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." <u>Exp. Indus. and Terminal Corp. v. New York State Dep't of Transp.</u>, 93 N.Y.2d 584, 589 (1999); <u>see</u> 22 N.Y. Jur. 2d, Contracts § 9 ("[S]igned and unsigned writings related to the same transactions and containing all the essential terms of a contract may properly be read together to evidence a binding contract" (citing <u>Weiner & Co. v. Teitelbaum</u>, 483 N.Y.S.2d 313 (1st Dep't 1985))). Whether writings exchanged by parties constitute a contract is a matter of law. <u>New Hampshire</u>

---

[6] The Court considers the October 9 version of the Agreement attached to the Counterclaims as it is "part of the pleading" and, because it is discussed in the Complaint, is "integral to the Complaint. <u>L-7 Designs</u>, 647 F.3d at 422 (quotations omitted).

Ins. Co. v. Wellesley Capital Partners, Inc., 200 A.D.2d 143, 14 (1st Dep't 1994) (citing Poel v. Brunswick-Balke-Collender Co., 216 N.Y. 310, 313 (1915)).

As relevant to this dispute, the material terms of the October 9 version that Guardhouse admits to signing and describes as the "Loan Agreement" (Counterclaims ¶28), and the October 10 version that Red Fort signed are the same and evidence mutual assent by both parties to enter into a contract. Specifically, Section 1.1 of both versions states that the lender agrees to make an initial disbursement of €1,750,000 to borrowers on the Disbursement Date, defined as October 10, 2018. (Doc 65 Ex. C § 1.1; Doc 5 Ex. 7 § 1.1.) Section 1.3 of both versions lists the reimbursement fee as €500,000 (Doc 65 Ex. C § 1.3(a); Doc 5 Ex. 7 § 1.3(a).) The rates of interest on the outstanding principal are the same. (Doc 65 Ex. C § 1.3(b)-(e); Doc 5 Ex. 7 § 1.3(b)-(e) (identifying interest accruing at 2.00% starting November 15, 2018 and increasing 3.00% per month thereafter.) The Maturity Date on both is set at January 15, 2019. (Doc 65 Ex. C at 6; Doc 5 Ex. 7 at 6.) The definition of an Event of Default appears materially the same in both versions. (Doc 65 Ex. C § 8.1; Doc 5 Ex. 7 § 8.1.)

Further, in its Answer, Guardhouse admits to all of the principal terms of the Agreement, including the amount of the initial disbursement and fee, the maturity date, the definition of an Event of Default, and the waiver of defenses clause (Compl. & Ans. ¶¶85-88.) Guardhouse makes no argument that any material terms of the October 10 version differ from the October 9 version which it admits to signing and describes as the "Loan Agreement." (Counterclaims ¶28.) "[S]imple clarifications and modifications" to an agreement do not indicate "a lack of meeting of the minds on the essential terms." Kolchins v. Evolution Mkts., Inc., 128 A.D.3d 47, 61 (1st Dep't 2015).

Red Fort performed under the Agreement. Red Fort disbursed the dollar equivalent of €1,750,000 to Guardhouse under the terms of the Agreement and by the required date. (Compl. & Ans. ¶94.)[7] It had no other material obligations to perform under the Agreement. Guardhouse has breached the contract. The Answer and Counterclaims admit that Guardhouse has not repaid any amount of the loan, and that the maturity date was January 15, 2019. (Compl. & Ans. ¶¶87, 106.) Red Fort has accrued damages in the amount of the unpaid disbursement and other unpaid amounts, including interest and fees associated with the loan, as stated in the terms of the Agreement.

Guardhouse raises affirmative defenses relevant to the breach of contract claim of fraud, usury, duress, and anticipatory repudiation. Guardhouse has stated in open court that its arguments for duress are subsumed within the Counterclaim arguments for unconscionability. (Tr. of Aug. 2, 2019 at 24 ll. 18-22.) Guardhouse further stated in open court that facts supporting its arguments related to other applicable affirmative defenses for Red Fort's breach of contract claim were laid out in its Counterclaims. (See, e.g., id. at 25 ll. 3-7; 35 ll. 5-12 (stating affirmative defenses of duress and usury go to the contract and discussing usury arguments).) For the reasons stated above and additionally explained in the next paragraph, these arguments fail as a matter of law.[8] None of the other affirmative defenses have been shown to have applicability to the breach of contract claim.

Criminal usury, while not available for affirmative relief, is available as an affirmative defense to an action seeking loan repayment. Colonial Funding, 252 F. Supp. 3d at 279-80. Under New York law, a loan is criminally usurious if the lender knowingly charges an

---

[7] The Answer and Counterclaims admit that Red Fort wired $1,982,271 to Iacono. (Compl. & Ans. ¶94.) The parties do not dispute that this amount is equivalent to €1,750,000.

[8] Guardhouse again alleges a new theory in its Opposition Brief related to a material dispute of fact as to Singh's emails to SDI Capital in January 2019 (Doc 82 at 10.) These arguments are not properly raised for the first time in opposition papers and will not be considered. Jordan, 91 F. Supp. 3d at 500.

interest rate of 25% or more.  See N.Y. Penal Law § 190.40; see also EMA Fin., 2019 WL 689237, at *6.  Guardhouse does not argue the rate of interest in the Agreement exceeded 25%. On the face of the Agreement, interest is provided on a tiered scale beginning at 2% and increasing 3% each month the loan is not repaid.  (Doc 65 Ex. C § 1.3(a)-(d); Doc 5 Ex. 7 § 1.3(a)-(d).)  Even if the figure could exceed the criminal usury cap on a per annum basis under some circumstances, the Agreement expressly provides that the interest rate is capped at "the highest rate permitted by applicable law," defined as the "Maximum Lawful Rate."  (Doc 65 Ex. C § 1.3(e); Doc 5 Ex. 7 § 1.3(e).)[9]

Guardhouse's Answer and Counterclaims admit the existence of the Agreement, Red Fort's payment of €1,750,000 pursuant to the Agreement and as a loan, and Guardhouse's non-payment long after the maturity date.  This establishes Guardhouse's breach of the Agreement and Red Fort's motion for judgment on the pleadings as to Count 1 of its Complaint will be granted.  Juster Assocs., 901 F.2d at 269.  Red Fort is entitled to its initial loan disbursement plus the €500,000 contractually-mandated fee, for a total of €2,250,000, plus interest as calculated pursuant to section 1.3 of the Agreement and costs and expenses as provided in section 9.4 of the Agreement.  Within fourteen (14) days, Red Fort shall submit to the Court a proposed order together with an affidavit reflecting the proper calculation of amounts owed to date under the Agreement.  Guardhouse will have seven (7) days to respond.

CONCLUSION

Iacono and Dilley's motion to dismiss the Complaint is GRANTED on Counts 3, 4, and 5 of the Complaint and otherwise DENIED. Red Fort's motion to dismiss Guardhouse's

---

[9] Even if the Agreement was criminally usurious, "numerous courts have recognized" that "there is no specific statutory authority for voiding a loan that violates the criminal usury statute."  Adar Bays, LLC v. GeneSYS ID, Inc., 341 F. Supp. 3d 339, 357 (S.D.N.Y. 2018) (quotation omitted); see In re Venture Mortg., 282 F.3d at 190-91 ("[I]t is an open question under New York law whether a criminally usurious loan is void.").  The Court need not decide the issue here.

counterclaims is GRANTED.  Red Fort's motion for judgment on the pleadings as to Count 1 of the Complaint, Breach of the Loan Agreement against Guardhouse, is GRANTED. The Clerk is directed to terminate the motions (Docs 73, 76.)

SO ORDERED.

_P. Kevin Castel_
P. Kevin Castel
United States District Judge

Dated: New York, New York
August 13, 2019