UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RED FORT CAPITAL, INC.,

                      Plaintiff,                                  19 cv 686 (PKC) (RWL)

      -against-                                                OPINION
                                                               AND ORDER

GUARDHOUSE PRODUCTIONS LLC et al.,

                      Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        Plaintiff Red Fort Capital, Inc. ("Red Fort") entered into a loan agreement (the "Loan Agreement") with certain of the defendants who thereafter failed to repay the loan in accordance with its terms.  This Court, among other rulings, granted Red Fort's motion for judgment on the pleadings as to the breach of the Loan Agreement.  Red Fort Capital, Inc. v. Guardhouse Productions LLC et al., 397 F. Supp. 3d 456 (S.D.N.Y. 2019) (Opinion & Order of Aug. 13, 2019 (Doc 124), the "Opinion.").

        On September 29, 2020, the Court held a hearing on the then-pending motions and matters in this case.  For the reasons stated on the record, the Court denied as untimely defendant Surya Iacono's motion to reconsider the Opinion insofar as it denied her motion to dismiss on the grounds of insufficient service of process.  Further, the Court adopted the Report and Recommendation of Magistrate Judge Lehrburger (Doc 225) in its entirety, and accordingly dismissed defendants Guardhouse entities' and Iacono's counterclaims and defenses.  Remaining before the Court is Red Fort's motion to dismiss the counterclaims of Russell Dilley, another guarantor (Doc 191).  For the reasons set forth below, Red Fort's motion will be granted.

BACKGROUND

In 2018, Guardhouse Productions LLC, Guardhouse Studios Italy S.R.L., Guardhouse Studios Management Limited, and Guardhouse Studios Scotland Ltd. (collectively, "Guardhouse Companies" or "Guardhouse") were seeking to develop two full-service television, film, and media studios in Milan, Italy and Edinburgh, Scotland. (Compl. (Doc 5) ¶¶ 22, 27.) Iacono and Dilley are co-owners of Guardhouse; Iacono is CEO, and Dilley is Guardhouse's principal funder. (Id. ¶ 3, 22.) Defendants claimed to be financing the project with a forthcoming $400 million bond offering that a private equity firm, SDI Capital ("SDI"), was arranging on Guardhouse's behalf. (Id. ¶ 29.) The Guardhouse Companies needed a bridge loan to pay various expenses, and sought financing against an outstanding invoice for €2,371,823 that they had issued in May 2018 to a French company, L'Operateur Partenaire Social ("L'Operateur"), and which was due to be paid on October 15, 2018. (Id. ¶ 31.) The Guardhouse Companies engaged a commercial real estate loan broker, JCAP Global Co. ("JCAP") to find a lender against the L'Operateur invoice. (Id. ¶ 34.) Iacono signed the JCAP agreement on behalf of the Guardhouse Companies. (Id. ¶ 35.) Through JCAP, the Guardhouse Companies were introduced to Red Fort as a potential lender. (Id. ¶¶ 36, 42-43.)

Red Fort and the Guardhouse Companies executed a Letter of Intent ("LOI") on August 20, 2018. (Id. ¶ 47.) Over the course of negotiating the transaction, Red Fort sought additional guarantees for the loan. Iacono provided Red Fort with a document purporting to set forth her personal finances, including her ownership of a house in Rome worth $5.6 million. (Id. ¶¶ 56-62.) Iacono guaranteed the loan by executing a power of attorney that granted Red Fort the right to mortgage against the Rome property in the event Guardhouse defaulted. (Id. ¶ 67.)

- 2 -

Red Fort asserts, on information and belief, that Iacono does not own this property and that the financial documents were forgeries. (Id. ¶¶ 61-63.)

Dilley also provided a personal guarantee on the loan. On October 7, 2018, Dilley sent Red Fort a copy of a personal check in the amount of $2,732,340. (Id. ¶ 74.) On or about October 9, 2018, however, Parminder Singh, CEO of Red Fort, traveled to Indiana to meet with Dilley in person. Dilley provided a different personal check made payable to Red Fort in the same amount, and post-dated to January 15, 2019. (Id. ¶ 75.) This personal check served as partial security of the loan. (Id.) As an additional guarantee, Red Fort secured L'Operateur's agreement to repay the invoice amount owing to Guardhouse directly to Red Fort. (Id. ¶ 76.)

The parties finalized the Loan Agreement between October 9-10, 2018. Iacono signed a redline version of the agreement on October 9. (Id. ¶ 82.) The agreement contained a principal commitment amount of €2,550,000, with an initial disbursement of €1,750,000 and an initial fee of €500,000. (Id.) On October 10, Iacono signed the execution version of the agreement, which is titled "Loan, Security and Guaranty Agreement." (Id. ¶¶ 83-84; id., Ex. 7.) The parties to the Loan Agreement were the Guardhouse Companies as Borrowers, Red Fort as the Lender, and Iacono as Guarantor. (Doc 5 ¶ 84.) Dilley separately acceded to the Loan Agreement by a Letter of Accession, also dated October 10, 2018. (Id.) Red Fort disbursed the initial payment of €1,750,000 to the Guardhouse Companies on October 10, 2018. (Id. ¶ 93.)

On November 15, 2018, L'Operateur asked Red Fort for additional time to repay the invoice. (Id. ¶ 98.) Red Fort emailed Dilley and Iacono on December 4, 2018, informing them of L'Operateur's failure to pay, and that increased interest rates on the loan were triggered under the Loan Agreement. (Id. ¶ 99.) A few days later, on December 12, Red Fort again emailed Dilley and Iacono, informing them of amounts due on the loan. (Id. ¶ 100.) The same

- 3 -

day, the Guardhouse Companies commenced suit against Red Fort and its CEO in the New York State Supreme Court, New York County, alleging that the Loan Agreement was invalid. (Id. ¶ 101.) On December 14, Red Fort declared an Event of Default under the Loan Agreement, and demanded immediate repayment of all amounts due. (Id. ¶ 106.) On January 6, 2019, Red Fort removed Guardhouse's lawsuit to this Court, and on January 8, 2019, Guardhouse voluntarily dismissed the suit. (Id. ¶¶ 104-105.) Red Fort has not received any amounts due under the Loan Agreement. (Id. ¶¶ 106-107.) On January 24, 2019, Red Fort commenced this action.

The Guardhouse Companies asserted various counterclaims, alleging that, inter alia, while unrepresented by counsel, Red Fort induced them to enter into a predatory and unconscionable agreement. (See Doc 65 ("Guardhouse Counterclaims") ¶¶ 1-3; id. ¶¶ 53-89.) Specifically, the Guardhouse Companies alleged that Iacono was asked to sign the signature page of the Loan Agreement four additional times, without being provided a full copy of the document; that she only recalls signing the October 9 version; and that she had "no idea" what she was signing, as she believed that the Loan Agreement was a "pure factoring agreement." (Id. ¶¶ 32-33, 37.) They further asserted that the Loan Agreement was for a larger amount than discussed during the negotiations. (Id. ¶¶ 35-37.)

In its Opinion, the Court granted judgment on the pleadings to Red Fort on the breach of the Loan Agreement claim, dismissed each of the Guardhouse Companies' counterclaims, and denied Iacono's motion to dismiss for Insufficiency of Process. (See Doc 124 at 19-28.)

Subsequent to the Court's Opinion, Magistrate Judge Lehrburger issued an Order to Show Cause why Iacono ought not be sanctioned for failure to comply with court orders requiring her to respond to written discovery requests and to appear for a deposition. (Doc 219.)

Judge Lehrburger held a hearing on January 15, 2020.  (See Hr'g Tr. of Jan. 15, 2020 (Doc 223) at 2.)  Based on Iacono's "willful defiance" of judicial orders, Red Fort requested sanctions, including striking defendants' defenses and counterclaims.  (Id. at 3; see also Doc 216 (Pl.'s Letter of Nov. 18, 2019).)  Judge Lehrburger had further ordered that Iacono appear at the show-cause hearing in person, which she did not.  (Doc 223 at 3.)

Iacono made various questionable submissions, including stating that she had a medical condition that would prohibit her from flying to New York for the deposition.  (See Defs.' Letter of Nov. 6, 2019 (Doc 207).)  However, Iacono's posts on social media indicated that she had been traveling by plane between Italy and Switzerland.  (Pl.'s Letter of Nov. 7, 2019 (Doc 210) at 2; id., Ex. 1; Doc 223 at 4-5.)  Judge Lehrburger denied Iacono's request to proceed with her deposition remotely or in Italy, and ordered that it go forward in New York on November 13.  (Order of Nov. 8, 2019 (Doc 212).)  The day before the hearing, Iacono emailed counsel for Red Fort, attaching what she described as a pro se submission, maintaining that, inter alia, the court has no jurisdiction over her, she has never been properly served in this case, she has full-time childcare responsibilities that prohibit her from traveling, that she is "seriously ill" with a broken eardrum and "infectious influenza" and that both her doctor and an unnamed airline instructed her not to fly.  (Pl.'s Letter of Jan. 14, 2020 (Doc 222), Ex. 1.)

Finding that Iacono had made false and misleading statements to the Court and repeatedly flouted judicial orders, Judge Lehrburger recommended to this Court the sanction of striking the answers of Iacono and the Guardhouse Companies, including counterclaims and defenses, and that judgment be entered against these defendants in favor of Red Fort.  (Report & Recommendation ("R&R") (Doc 225).)  No party filed objections to the R&R.  Following a hearing addressing several open matters, the Court adopted the R&R in its entirety and

accordingly ordered the dismissal of the Guardhouse entities' and Iacono's counterclaims and defenses, and entry of judgment against those defendants and in favor of Red Fort.[1]

LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." Revonate Mfg., LLC v. Acer Am. Corp., 12 cv 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013) (internal quotation marks and citation omitted). Red Fort moves to dismiss Dilley's counterclaims for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., and/or for lack of personal jurisdiction over Red Fort as to certain of these claims, pursuant to Rule 12(b)(2), Fed. R. Civ. P.

To survive a motion to dismiss under Rule 12(b)(6), a complaint or counterclaim "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). When making this assessment, a court draws all reasonable inferences in favor of the non-movant. In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the [] claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-209 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

---

[1] Had the Court not adopted the R&R as to Iacono, it would have dismissed her counterclaims for substantially the same reasons that it dismisses Dilley's counterclaims.

DISCUSSION

      A.   This Court Has Personal Jurisdiction Over Red Fort on the
           Tort Counterclaims Asserted by Dilley.

Red Fort asserts that Dilley's counterclaims sounding in tort are outside the parties' consent to jurisdiction in the Loan Agreement, and therefore, that these claims should be dismissed pursuant to Rule 12(b)(2), Fed. R. Civ. P. for lack of personal jurisdiction.

The Loan Agreement provides, in relevant part: "Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, each of the parties executing this Agreement hereby accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts . . . . The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions."  (Doc 5, Ex. 7 § 9.17(b).)

Red Fort contends that the tort counterclaims are not "with respect to" the Loan Agreement, and therefore are outside the parties' consent to jurisdiction.  The reach of a forum selection clause, however, is not so limited.  See Bense v. Battery Sys. of Am., Inc., 683 F.2d 718, 720 (2d Cir. 1982) (internal quotation marks omitted) (contractual forum selection clause that provided for specific venue for causes of action "arising directly or indirectly from" the agreement covered claim brought pursuant to federal antitrust law).  "The appropriate inquiry is whether the scope of the forum selection clause extends to tort-based claims arising in conjunction with the contract claims governed by the forum selection clause."  Brennen v. Phyto-Riker Pharm., Ltd., 01 cv 11815 (DLC), 2002 WL 1349742, at *4 (S.D.N.Y. June 20, 2002)

(internal quotation marks and citation omitted); see also ErGo Media Capital, LLC v. Bluemner, 15 cv 1377 (LGS), 2015 WL 6442252, at *2 (S.D.N.Y. Oct. 23, 2015) ("[C]laims sounding in tort rather than in contract do not automatically place them beyond the scope of the forum selection clause."). Indeed, "[a] contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties . . . or if the tort claims involve the same operative facts as a parallel claim for breach of contract." Elec. Mobile Cars, LLC v. Elec. Mobile Cars, Inc., 12 cv 5202 (JSR), 2012 WL 5264454, at *2 (S.D.N.Y. Oct. 17, 2012) (internal quotation marks and citation omitted); but see Osuna v. Citigroup Inc., 17 cv 1434 (RJS), 2018 WL 6547205, at *5, *5 n.4 (S.D.N.Y. Sept. 28, 2018) (where contract claims were dismissed, forum selection clauses contained in those contracts were "of no moment" and did not require court to consider jurisdiction over tort claims, noting: "Plaintiffs' claim for tortious interference, which is founded in defamation, depends on harms Plaintiffs suffered in their dealings . . . with third parties and does not appear to fall within the scope of those provisions.").

The alleged damaging statements here depend on the contractual relationship memorialized in the Loan Agreement.[2] Dilley alleges that Mr. Singh, CEO of Red Fort, emailed SDI Capital, which was engaged in securing the $400 million bond on behalf of the Guardhouse Companies, and stated that, inter alia: Iacono had borrowed 2.25 million Euros from Red Fort; Red Fort had UCC claims against her companies; she made false and fraudulent statements, including representations about her net worth and ownership of property in Italy that she does not in fact own; she previously filed for bankruptcy; and Red Fort had received "cooperation"

---

[2] Confusingly, defendants simultaneously contend that the "Loan Agreement . . . has no bearing whatsoever with the current claims" and that the tort counterclaims "would not even exist had the parties not entered into the Loan Agreement." (Defs.' Mem. Law (Doc 206) at 4, 13.)

from other people who Iacono "conned in the past, and are compiling her history of each along with criminal misdirection to us."³ (Doc 137 ¶¶ 51-55; id. Ex. H.) The parties' relationship that arose from negotiation and execution of the Loan Agreement underlies these statements. Further, Singh's allegedly defamatory statements about Iacono and their purported damage to the $400 million bond offering involve many of the "same operative facts" as Red Fort's Complaint. Elec. Mobile Cars, LLC, 2012 WL 5264454, at *2. For example, the Complaint alleges that Iacono presented Red Fort with what later appeared to be a forged statement of personal finances and misrepresented ownership of property in Italy (Doc 5 ¶¶ 57-63), and that Red Fort investigated Iacono's purported fraud (id. ¶¶ 108-17). Red Fort cannot assert a claim for breach of contract but then obtain dismissal of Dilley's tort-based counterclaims for lack of personal jurisdiction where those counterclaims arise from some of the same underlying allegations as those in the Complaint.

The Court concludes that the Loan Agreement's forum selection clause properly extends to Dilley's tort claims against Red Fort, and that Rule 12(b)(2), Fed. R. Civ. P. is not a basis to dismiss these counterclaims. For the reasons discussed below, these claims will be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P.

  B. <u>The Tort Counterclaims Fail to State a Claim For Relief.</u>

Dilley alleges that Singh "repeatedly" contacted the bond writers and other of defendants' financial partners in the $400 million bond offering and made defamatory statements about Iacono that interfered with Guardhouse closing this transaction. Based on these

---

³ The Court properly considers this email on the motion to dismiss as incorporated in the counterclaims; it is cited throughout and submitted as an attachment. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (a complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citation omitted); (see Doc 137, Ex. H.)

- 9 -

allegations, Dilley asserts three causes of action: tortious interference with contract, tortious interference with prospective economic advantage (or prospective contractual relations), and tortious interference with business relations. (Doc 137 ¶¶ 61-80.) These claims fail.

### i. Tortious Interference with Contract

In order to state a claim for tortious interference with a contract under New York law,[4] the claimant must establish: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks and citation omitted). Fairly read, Dilley's tortious interference with contract claims may allege either of at least two scenarios. In either case, these claims fail to satisfy one or more of the required elements.

First, if Dilley is alleging that Singh's statements to SDI Capital interfered with Guardhouse's contract with SDI, these counterclaims fail because (1) Guardhouse, but not Dilley, was party to the contract with SDI; and (2) there is no allegation that SDI actually breached its contract with Guardhouse. The counterclaims allege that SDI and the Guardhouse Companies negotiated and reached an agreement to structure a $400 million bond that would fund the Guardhouse Companies' future business projects. (Doc 137 ¶¶ 49-50.) An individual "shareholder may not secure a personal recovery for alleged injury to a corporation." Schwartz v. Nordstrom, Inc., 160 A.D.2d 240, 241 (1st Dep't 1990); Abrams v. Donati, 66 N.Y.2d 951,

---

[4] As the Court noted in its August 13 Opinion, the parties' briefs "assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (alteration in original) (internal quotation marks and citation omitted); (Doc 124 at 6; see generally Pl.'s Mem. Law (Doc 192); Defs.' Mem. Law (Doc 206).)

953 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action . . . ."); see also PI, Inc. v. Ogle, 95 cv 1723 (JGK), 1997 WL 37941, at *3 (S.D.N.Y. Jan. 30, 1997) (citing Abrams). Assuming there was a valid contract here, it was between the Guardhouse Companies and SDI, not Dilley and SDI. Therefore, Dilley cannot maintain a claim of tortious interference with a contract to which he was not a party.

Further, Dilley does not allege that SDI breached its agreement with Guardhouse. SDI was going to "arrange funding . . . through institutional fund raising" for Guardhouse.[5] (Defs.' Mem. Law (Doc 206), Ex. G.) He contends that "SDI and the other financial institutions and individuals involved in this financial transaction have become increasingly worried" as a result of Singh's statements to SDI, and that Guardhouse has not yet received any sum of money. (Doc 137 ¶ 54.) The problem, however, is that SDI was not going to fund the bond itself; it was working on Guardhouse's behalf to raise these funds from other parties. That Guardhouse has not yet received the $400 million bond does not mean that SDI is in breach of its agreement with Guardhouse; SDI may still be working on raising this money. Indeed, as Dilley appears to concede, "SDI is free not to believe these wrongful allegations and maintain intact its business relationship . . . ." (Doc 206 at 11.) In any event, Dilley has not plausibly alleged that SDI breached its contract with Guardhouse, which is an additional basis to dismiss the tortious interference with contract counterclaims.

Second, to the extent that Dilley alleges that Singh's statements to SDI tortiously interfered with defendants' contracts with other, unnamed third parties who were going to fund

---

[5] Defendants have not attached Guardhouse's contract with SDI to their counterclaims, but have submitted with their memorandum of law in opposition to Red Fort's motion SDI's letters regarding the $400 million bond offering. (Doc 206.) Because the nature of the relationship between the Guardhouse Companies and SDI is integral to this counterclaim, the Court may consider this document here. Int'l Audiotext, 62 F.3d at 72 (where the complaint did not submit the subject agreement but "rel[ied] heavily upon its terms and effect," the agreement was "integral to the complaint" and the court "consider[ed] its terms" on motion to dismiss).

the bond, this alternative construction of the counterclaim also fails.  Courts in this District have consistently dismissed tortious interference with contract claims where no specific contract or parties to the alleged contract have been plead.  See, e.g., Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 367-68 (S.D.N.Y. 2012) (collecting cases).  Dilley does not point to any particular contract with specific third-party financial institutions or individuals that Singh's statements purportedly impeded.  For this reason, too, Dilley's tortious interference with contract counterclaims will be dismissed.

> ii. Tortious Interference with Business Relations

Dilley also asserts counterclaims for tortious interference with prospective contractual relations and tortious interference with business relations.  (Doc 137 ¶¶ 68-80.)  At the outset, the Court notes that "tortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action." Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C., 455 F. App'x 102, 105 (2d Cir. 2012) (summary order); see Catskill Development, L.L.C. v. Park Place Entmt. Corp., 547 F.3d 115, 132 (2d Cir. 2008) (noting that the tort is alternatively called interference with business relations or prospective economic advantage).  Therefore, the Court addresses only one version of these claims.  For substantially similar reasons that Dilley's tortious interference with contract counterclaim fails, so too do the claims of tortious interference with business relations.

"To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." Scutti Enterprises, LLC v. Park Place Entmt. Corp., 322 F.3d 211, 215 (2d Cir.

2003); see also Kirch, 449 F.3d at 400 (listing the four elements of a tortious interference with prospective economic advantage claim).

To the extent these counterclaims allege that Singh's statements interfered with Guardhouse's relationship with SDI, these claims fail. Dilley alleges that the $400 million bond was going to be issued to the Guardhouse Companies for construction of film studios in Milan and Scotland. (Doc 137 ¶¶ 69-70.) The business relationship, therefore, was between Guardhouse and SDI. For the reasons discussed above, Dilley cannot personally state claims for alleged injuries that belong to Guardhouse.

Nor is there any indication that SDI stopped working on Guardhouse's behalf to obtain financing. There is no allegation that Guardhouse's relationship with SDI broke down as a result of Singh's email, only that the $400 million bond was not released to Guardhouse. (Doc 137 ¶¶ 69-80.) However, as explained above, it was not SDI itself that would finance the bond, but SDI would work to obtain "institutional fund raising" for Guardhouse. (Doc 206, Ex. G.) Dilley's attempt to augment the allegations in the counterclaims with statements in defendants' memorandum of law that Iacono had to "start over again on [the] business project, and, thus to abandon the Guardhouse Entities" is improper. (Doc 206 at 11.) Indeed, as this Court stated in its Opinion: "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." (Doc 124 at 24) (internal quotation marks and citation omitted).

If Dilley's claims are read to allege interference with business relations with unnamed third parties that SDI organized to fund the bond, then these claims fail for the separate reason that they do not allege any particular business relationship with requisite specificity. As in the context of tortious interference with a contract, a claim of tortious interference with business relations must "allege a specific business relationship with an identified third party with

which the defendants interfered." Mehrhof v. Monroe-Woodbury Central School District, 168 A.D.3d 713, 714 (2d Dep't 2019). Other than SDI, Dilley does not name any other individual or entity involved in the $400 million bond transaction, nor does he come forward with any specific allegation that Singh communicated with parties other than SDI. Therefore, Dilley fails to state claims of tortious interference with business relations with any of those other purported parties.

For these reasons, Dilley's tortious interference counterclaims will be dismissed.

iii.  Defamation

Dilley alleges a defamation counterclaim based on Singh's email to SDI. (Doc 137 ¶¶ 56-60.) To state a claim for defamation under New York law, a plaintiff must show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm . . . ." Stepanov v. Dow Jones & Co., 120 A.D.3d 28, 34 (1st Dep't 2014).

Dilley's defamation claim fails as a matter of law because he does not allege that any defamatory statement was made about him. "[P]laintiffs in defamation proceedings bear the burden of demonstrating that . . . the libel designates the plaintiff in such a way as to let those who knew [him] understand that [he] was the person meant." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980) (citation omitted). Dilley relies on the statements in Singh's email—which pertain to Iacono—to allege that he suffered harm as Iacono's business partner. (Doc 137 ¶¶ 59-60.) Dilley cannot maintain a claim for defamation by association. Cohn v. Nat'l Broadcasting Co., 67 A.D.2d 140, 146 (1st Dep't 1979) (member of a law firm could not allege defamation on behalf of the firm "upon mere conclusory assertion that the reputation of the firm is inextricably tied to [the plaintiff] . . . . No such derivative claim for defamation exists.").

    iv.  Fraudulent Inducement

Dilley alleges that Singh fraudulently induced Dilley to sign the Accession Letter guaranteeing the Loan Agreement. "To state a claim for fraudulent inducement under New York law, a plaintiff must show: (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cir. 2005). As a fraud claim, it must be plead with particularity. Rule 9(b), Fed. R. Civ. P. Dilley's fraudulent inducement claim fails.

Dilley asserts that he understood his signature on the Accession Letter to be an intent to guarantee the Loan Agreement, not an actual guaranty thereof. (Doc 137 ¶ 101.) Specifically, Dilley alleges that the Loan Agreement had not yet been signed as of the time of the Accession Letter. (Id.) This is belied by Dilley's own pleading: Dilley maintains, like Iacono and the Guardhouse Companies, that the Loan Agreement was executed on October 9, 2018, and that Iacono does not recall signing the Loan Agreement on October 10, which is when both the executed Loan Agreement and the Accession Letter are dated. (Doc 137 ¶¶ 25, 31; Doc 5, Ex. 7; Accession Letter of Oct. 10, 2018 (Doc 85, Ex. 10).) Further, the Accession Letter explicitly states that Dilley "agrees to be bound by the terms of the [Loan Agreement] as a Guarantor," and that the Accession Letter was "signed on behalf of the Lender . . . ." (Doc 85, Ex. 10.)

Dilley contends that Singh should have told Dilley that the Accession Letter constituted a binding guaranty, and that Dilley merely succumbed to Singh's "high pressure tactics" that induced him to sign the Accession Letter. (Doc 137 ¶¶ 101-103.) Dilley does not provide any detail as to what these alleged "high pressure tactics" entailed, and thus fails to plead

fraud with particularity. Nor does Dilley set forth any basis for why Singh had a duty to explain the clear terms of the Accession Letter. See Nat'l Union Fire Ins. Co. of Pittsburgh v. Walton Ins. Ltd., 696 F. Supp 897, 903 (S.D.N.Y. 1988) (defendant did not have duty to explain contents of agreement negotiated at arms' length). Dilley's assertion that Singh was able to fraudulently induce Dilley's signature of the Accession Letter because Dilley had no financial acumen and was not represented by counsel during these discussions is also without merit, as his engagement in business demonstrates. Dilley is Iacono's business partner in the Guardhouse Companies, and had sufficient personal funds to write not one, but two checks to Red Fort in the amount of €2,371,823. (Doc 137 ¶¶ 22-23, 56.)

For these reasons, Dilley's fraudulent inducement counterclaim will be dismissed.

v. Dilley's Unconscionability Claims

Guardhouse asserted that the Loan Agreement was procedurally and substantively unconscionable; Dilley makes the same claims with respect to the Accession Letter. (Doc 65 ¶¶ 61-73; Doc 137 ¶¶ 81-98.) As the Court noted in its Opinion, whether unconscionability may only be raised as an affirmative defense appears an open question. Compare Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 285 (S.D.N.Y. 2017) (citing cases stating unconscionability is an affirmative defense), with Mayaguez S.A. v. Citigroup, Inc., 16 cv 6788 (PGG), 2018 WL 1587597, at *11-15 (S.D.N.Y. Mar. 28, 2018) (considering cause of action for unconscionability); (see Doc 124 at 22.) Even assuming arguendo that unconscionability may be plead as an affirmative cause of action, these claims, like those of Guardhouse, do not plausibly allege procedural or substantive unconscionability, and will be dismissed.

1. Procedural Unconscionability

"Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (internal quotation marks and citation omitted). "'A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made,' which means a showing of 'absence of meaningful choice on the part of the parties together with contract terms which are unreasonably favorable to the other party.'" (Doc 124 at 24) (quoting Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988)).

Dilley alleges many of the same facts that Guardhouse did in support of its unconscionability counterclaims. Specifically, Dilley asserts that the Accession Letter is procedurally unconscionable because of Red Fort's superior financial acumen and bargaining power in negotiating the Loan Agreement, and the fact that Red Fort was represented by counsel throughout this process while Dilley was not. (Doc 137 ¶¶ 82, 86, 91.) As where Guardhouse's counterclaim failed based on substantially similar allegations (see Doc 65 ¶ 63; Doc 124 at 22), Dilley's re-allegation of them does not plausibly plead a claim of procedural unconscionability.

First, Dilley is a medical doctor who is engaged in business. He is "a far cry from the prototypical 'uneducated' and 'needy' individual for whom the unconscionability doctrine was fashioned."[6] Nayal v. HIP Network Servs. IPA, Inc., 620 F. Supp. 2d 566, 573 (S.D.N.Y.

---

[6] Dilley's assertion that he believed he had no choice but to sign the Accession Letter is belied by the Guardhouse Companies' admission that they were considering a term sheet with another lender, but that Iacono wanted to pursue the deal with Red Fort. (Doc 124 at 23; Doc 65 (Answer) ¶ 70; Doc 5 ¶ 70.) The Court notes, however, that Dilley denies these claims in his answer. (Doc 137 (Answer) ¶ 53.)

2009) (rejecting doctor's claim of procedural unconscionability with respect to arbitration clause). Second, that Dilley was unrepresented is immaterial. See Credit Alliance Corp. v. Joshco Min. Corp., 90 F.R.D. 187, 188 (S.D.N.Y. 1981) ("The mere assertions that the individual defendants did not read the contract, and were not represented by counsel does not warrant a finding of procedural unconscionability."). Dilley knew how to obtain counsel if he so chose. He has been represented by counsel in this action, and alleges that Guardhouse, of which he is a co-owner and investor, consulted an Italian lawyer regarding Iacono's guarantee of the Loan Agreement (Doc 137 ¶ 16); he could have done the same with respect to his own guarantee.

That Dilley allegedly did not "meaningful[ly] review" the Accession Letter does not save his claim. (Doc 137 ¶ 89.) "'[A] party who signs a contract is presumed to have read it.'" (Doc 124 at 24) (quoting SOL Grp. Mktg. Co. v. Lines, 14 cv 9929 (SHS), 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016)). Dilley's failure to read or review the Accession Letter does not make it a procedurally unconscionable contract.

Further, Dilley alleges that when meeting with Singh to discuss and execute the Accession Letter, Singh utilized "high pressure tactics" to get Dilley to sign the agreement. (Doc 137 ¶¶ 87, 91.) However, Dilley does not detail what these particular "tactics" were; the allegation that Singh had threatened Iacono that if she used an attorney other than Singh's, Red Fort would not lend Guardhouse the money, does not support Dilley's claim. Dilley fails to plausibly plead facts that would show how he was pressured into signing the Accession Letter based on an alleged threat to Iacono; Dilley makes the conclusory statement that Singh's threat "directly influenced [him]," but goes provides no additional explanation. (Doc 137 ¶ 85.)

In sum, Dilley provides no basis to conclude that the Accession Letter was the product of procedural unconscionability, and therefore, this counterclaim will be dismissed.

2. <u>Substantive Unconscionability</u>

As with Guardhouse's unconscionability counterclaims, Dilley's failure to plead procedural unconscionability dooms his substantive unconscionability claim. (Doc 124 at 25.) "[G]enerally the party seeking to void a provision must allege both procedural and substantive unconscionability." <u>SOL Grp. Mktg.</u>, 2016 WL 20544, at *7 (citing <u>NML Capital v. Republic of Argentina</u>, 621 F.3d 230, 237 (2d Cir. 2010)).

Assuming <u>arguendo</u> that Dilley had sufficiently plead procedural unconscionability such that the Court would reach his substantive unconscionability claim, this claim would also fail. Dilley alleges that the Accession Letter's terms unreasonably favor Red Fort, and that no reasonable person, represented by counsel, would have entered into this agreement that included guarantees that "overly exceeded the initial loan amount." (Doc 137 ¶¶ 93-94.) However, as the Court stated with respect to Guardhouse's same argument about the Loan Agreement, "[s]imply because the terms are a 'bad bargain' . . . does not mean they are 'so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to [their] literal terms.'" (Doc 124 at 26) (quoting <u>Mayaguez</u>, 2018 WL 1587597, at *17 (internal quotation marks and citation omitted, alteration in original)). Dilley signed the Accession Letter and is presumed to have read its terms, which incorporated the Loan Agreement by reference. (Doc 85, Ex. 10.) This Court previously concluded that in signing the Accession Letter, Dilley agreed to be bound by the Loan Agreement's terms. (Hr'g Tr. of Mar 29, 2019 (Doc 88) at 5.) In addition, as discussed above, that Dilley allegedly had relatively less financial acumen or experience than Red Fort and Singh does not save his claim. (<u>See</u> Doc 137 ¶ 96.)

For these reasons, Dilley's substantive unconscionability counterclaim will be dismissed.

CONCLUSION

For these reasons explained, Red Fort's motion to dismiss Dilley's counterclaims is GRANTED. The Clerk is respectfully directed to terminate the motion (Doc 191).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      September 30, 2020