UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RED FORT CAPITAL, INC.,

                            Plaintiff,                                  19 cv 686 (PKC) (RWL)

        -against-                                          OPINION
                                                                             <u>AND ORDER</u>

GUARDHOUSE PRODUCTIONS LLC et al.,

                            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        Plaintiff Red Fort Capital, Inc. ("Red Fort") entered into a loan agreement (the "Loan Agreement") with certain of the defendants who thereafter failed to repay the loan in accordance with its terms. This Court granted Red Fort's motion for judgment on the pleadings against the borrowers as to the breach of the Loan Agreement. (Opinion and Order of Aug. 13, 2019 (Doc 124).) The Court also granted Red Fort's motion to dismiss the counterclaims of Russel S. Dilley, co-owner of the borrowers who allegedly guaranteed the payments under the Loan Agreement. (Opinion and Order of Sept. 30, 2020 (Doc 237) (the "2020 Opinion").)

        Red Fort now moves for summary judgment against Dilley on three claims: breach of the guaranty (Count One), fraud (Count Two) and violation of the Indiana Bad Check Statute, Ind. Code § 26-2-7-4 (Count Six). For the reasons set forth below, Red Fort's motion will be granted as to the breach of the guaranty and otherwise denied.

BACKGROUND

The Court sets forth only the facts that relate to the claims against Dilley. It draws all reasonable inferences in favor of non-movant Dilley.

In 2018, Guardhouse Productions LLC, Guardhouse Studios Italy S.R.L., Guardhouse Studios Management Limited, and Guardhouse Studios Scotland Ltd. (collectively, "Guardhouse Entities") were seeking bridge financing in connection with their plans to develop two film and media studios in Italy and Scotland. (Singh Feb. 27, 2019 Decl. ¶ 2.) Dilley was a co-owner and principal funder of the Guardhouse Entities and Ms. Suraya G. Iacono was his business partner. (Id. ¶¶ 5, 20.) Initially, Red Fort had focused upon securing a guarantee of the loan obligations from Ms. Iacono and the Loan Agreement was drafted accordingly. (Id. ¶ 4.) In early October 2018, which was shortly before the execution of the Loan Agreement, Dilley's name surfaced as an additional guarantor. (Id. ¶ 5.)

The broker of the financing transaction was the initial intermediary with Dilley Iacono and reported that Dilley would provide a post-dated check to be used as a form of guaranty. (Id. ¶ 6.) The discussion between Parminder Singh, CEO of Red Fort, Iacono and the broker evolved into a discussion of Dilley signing as a guarantor of the loan and also providing a post-dated check. (Id. ¶ 7.) Iacono provided the broker who in turn provided Singh a copy of Dilley's post-dated check postdated to January 15, 2019 for a $2,732,340 and a screenshot of Dilley's Morgan Stanley brokerage account. (Id. ¶ 8.) Dilley's accountant transmitted a letter directed to Red Fort attesting to Dilley's net worth at approximately $18.2 million; the letter was also signed by Dilley. (Id. Ex. 4.) The accountant has submitted a declaration in this action denying that he prepared, signed or, prior to this action, ever saw the letter making the foregoing

representation and that he did not give consent to anyone to affix his signature. (Dankert Apr. 14, 2020 Decl. ¶¶ 5-9 & Ex. 1.)

To avoid making cumbersome amendments to the Loan Agreement, Red Fort proposed an "Accession Letter" in which Dilley "agrees to be bound by the terms of the [Loan] Agreement as a Guarantor. . . ." (Id. ¶ 10-13.) Singh transmitted the draft Accession Letter and the draft Loan Agreement to Iacono and the broker on October 8, 2018 and the same day received an email from Iacono that "Dr. Dilley is signing his Guarantee and will be scanning it back shortly." (Id. ¶14 & Ex. 7.) Dilley emailed the signed Accession Letter dated October 8, 2018, to Iacono, who forwarded it to the broker, who, in turn, forwarded it to Singh. (Id. ¶ 15 & Ex. 8.) Dilley sent the post-dated check for $2,732,340 to Red Fort on October 9. (Id. ¶ 18 & Ex. 12.) Singh proposed that he and Dilley meet face to face that same day and they agreed to meet in Remington, Indiana. (Id. ¶ 19.)

At the time of the meeting, the check had not arrived from Dilley and Dilley provided a second post-dated check at the meeting. Singh took a selfie of the two sitting at a table with Dilley holding up a copy of the second post-dated check. (Id. ¶ 20 & Ex. 14.)

The Loan Agreement was dated as of October 10, 2018. (Id. ¶ 26.) Although Dilley had signed the Accession Letter on October 8 and October 9, he was asked to re-execute it as of the date of the Loan Agreement, presumably because the Accession Letter is premised on the existence of a Loan Agreement. When the re-executed version was sent dated October 10, it left blank the date of the Loan Agreement and Dilley was asked to fill in the date of the Loan Agreement; Dilley complied and returned the document to Singh. (Id. ¶¶ 23-26.) Singh countersigned the document on behalf of Red Fort. (Id. ¶ 27.)

The Loan Agreement made the execution and delivery by Dilley of an accession agreement and delivery of a check in the amount of $2,732,340 post-dated to no later than January 15, 2019, a condition to Red Fort's extension of the loan:

> <u>Guarantor Accession</u>.  Dr. Russell Dilley shall have executed and delivered to the Lender (i) an accession document agreeing to be bound by the provisions of Article 7 of this Agreement as a guarantor and (ii) a certificated check post-dated to no later than January 15, 2019, in the amount of $2,732,340.

Loan Agreement §3.1(j).

The Accession Letter executed and delivered by Dilley is brief and appears to have varied only as to dates from the prior versions sent to and executed by Dilley.  It reads as follows:

**Accession Letter**

To: Red Fort Capital, Inc., as Lender

From: Dr. Russell Dilley

Dated:       Oct *10*       2018

Dear Sirs

**Loan, Security and Guaranty Agreement dated as of October [10], 2018 among Guardhouse Productions, LLC, the other borrowers party thereto, Surya Iacono as guarantor, and Red Fort Capital, Inc., as Lender (the "Agreement")**

1. We refer to the Agreement. This is an Accession Letter. Terms defined in the Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2. The undersigned agrees to be bound by the terms of the Agreement as  a Guarantor,

      and hereby agrees to the provisions of Article 7 of the Agreement, *mutadis mutadis* [sic].[1]

3.    The undersigned's notice details are as follows:

      [REDACTED]

4.    This Accession Letter and any non-contractual obligations arising out of or in connection with it are governed by the laws of the State of New York.

5.    This Accession Letter has been signed on behalf of the Lender and executed and the undersigned on the date set out above.

  s/Russel S. Dilley

  Dr. Russel Dilley

(Doc 258-8.)

      There is no dispute that Red Fort disbursed the dollar equivalent to €1,750,000 to the Guardhouse Entities and that none of the money has been repaid. (D. Resp. to Rule 56.1 Statement at ¶¶ 24 & 28; Singh Apr. 6, 2021 Decl. ¶ 4.)[2] Red Fort declared an event of default under section 8.1(f) of the Loan Agreement after the Guardhouse Entities filed suit against Red Fort in a New York Court. (D. Resp. to Rule 56.1 Statement ¶ 27.) Dilley stopped payment on the check he delivered to Singh at the meeting in Remington, Indiana. (Id. ¶ 29.)

      Red Fort seeks summary judgment on a breach of the contractual guaranty and also a fraud claim against Dilley premised on his preparation or submission of several fake

---

[1] The intended phrase was *mutatis mutandis*. "This Latin phrase simply means that the necessary changes in details, such as names and places, will be made but everything else will remain the same." In re McMahon, 235 B.R. 527, 536 n.7 (S.D.N.Y. 1998). As applied here, it means that refences in Article 7 of the Loan Agreement would now apply to him, except such things as the address for notice.

[2] Citations to evidence in this Opinion and Order is for illustrative purposes and is not intended to imply that the cited evidence is the only support for the proposition. In the case of the parties' Local Rule 56.1 Statements, the reference is intended to refer to the evidence cited by the plaintiff to support the statement and Dilley's response.

documents on which Red Fort relied. (P. Mem. at 16.) Red Fort also seeks summary judgment under the Indiana Bad Check Statute, Ind. Code § 26-2-7-4, for Dilley's action in stopping payment on the check delivered to Red Fort at the Remington meeting. (P. Mem at 23.)

Dilley responds to the motion with a five-page declaration. He states among other things "I have seen guarantees before, and the Accession Letter that I was asked to sign did not look like any guarantee I had ever seen before. . . . It seemed clear to me that this was some sort of a pre-contract document [and] that I was showing that I intended to guarantee the loan agreement sometime in the future, when the document was completed and I could have an opportunity to go over the terms more fully." (Dilley Apr. 22, 2021 Decl. ¶ 7.) He states that "[i]t was Mr. Singh who pushed and used high pressure tactics to get his agreement signed." (Id. ¶ 20.) He said he had stopped payment on both checks delivered to Red Fort only after he learned that Singh had contacted his bank to find out if there were sufficient funds to cover both checks. (Id. ¶13, 24.)

PROCEDURAL HISTORY

The Court will not recite the entire history of the litigation. It is noteworthy that the Court's 2020 Opinion addressed and dismissed Dilley's counterclaims for tortious interference with contract, tortious interference with prospective economic advantage (or prospective contractual relations), and tortious interference with business relations, defamation, fraudulent inducement to enter into the Accession Letter and procedural and substantive unconscionability of the Accession Letter.

The Court also notes the difficulties that Red Fort has encountered in obtaining discovery in this action. Magistrate Judge Robert W. Lehrburger issued a Report and Recommendation, adopted by this Court, that the answer and counterclaim of the Guardhouse

Entities and Iacono be stricken for repeated failure to comply with discovery Orders, including Iacono's failure to appear at a hearing despite an Order that she do so. (See, e.g., Doc 174, 196, 223, 225, 235.)[3] Dilley has asserted his Fifth Amendment privilege against self-incrimination in response to over 40 of Red Fort's Requests to Admit. (Doc 258-21.) A court may draw an adverse inference when a party in a civil action invokes the privilege against self-incrimination. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); LiButti v. United States, 107 F.3d 110, 121 (2d Cir. 1997); Brink's Inc. v. City of New York, 717 F.2d 700, 709 (2d Cir. 1983). Neither party has briefed the adverse inference issue and the Court declines to draw an adverse inference from the invocation of the privilege on this motion.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

---

[3] For example, "Iacono made various questionable submissions, including stating that she had a medical condition that would prohibit her from flying to New York for the deposition. (See Defs.' Letter of Nov. 6, 2019 (Doc 207).) However, Iacono's posts on social media indicated that she had been traveling by plane between Italy and Switzerland. (Pl.'s Letter of Nov. 7, 2019 (Doc 210) at 2; id., Ex. 1; Doc 223 at 4-5.)" 2020 Opinion at 5.

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y, 575 F.3d at 204 (internal citations omitted).

DISCUSSION

    A. Summary Judgment Will Be Granted in Favor of Red Fort on the Guaranty

To recover on a guaranty, a plaintiff must come forward with evidence of "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the

guaranty. . . ." Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 25 N.Y.3d 485, 492 (2015); Sarfati v. Palazzolo, 142 A.D.3d 877, 877 (1st Dep't 2016); see also UMB Bank N.A. v. Bluestone Coke, LLC, No. 20-cv-2043, 2020 WL 6712307 at *4 (S.D.N.Y. 2020) (Liman, J.).[4]

Red Fort has come forward with the existence of the Accession Letter executed and delivered by Dilley which plainly provides that "[t]he undersigned [i.e. Dilley] agrees to be bound by the terms of the Agreement as a Guarantor, and hereby agrees to the provisions of Article 7 of the Agreement the Loan Agreement . . . ." (Doc 258-8.) It has also produced the Loan Agreement in which Article 7 provides in part as follows:

> The Guarantor hereby absolutely, unconditionally and irrevocably guarantees, as a guaranty of payment and not a guaranty of collection, the full and prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all of the Obligations, whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses or otherwise of the Borrowers to the Lender. . . .

Loan Agreement § 7.1(a). (Doc 258-31.)

New York recognizes that the "broad, sweeping and unequivocal language" of a contractual guaranty may foreclose any challenge to the enforceability of the agreement "as well as any other possible defense" to the guarantor's liability for the obligations of the principal obligor. Dresser-Rand Co. v. PDVSA Petroleo, S.A., No. 20-1990, 2021 WL 2878936, at *2 (2d Cir. July 9, 2021) (quoting Navarro, 25 N.Y.3d at 494.)

Dilley does not dispute that he executed the Accession Letter (Dilley's Answer at ¶ 61) and delivered the post-dated check (Id. at ¶¶ 57-58) but asserts that he thought the Accession Letter was an "intent to guarantee" rather than a guarantee. (Dilley Apr. 22, 2021

---

[4] By the express terms of the Accession Letter, it is governed by New York law. (Accession Letter at ¶4.)

Decl. ¶¶ 6-8.) But there are no words in the brief Accession Letter that support his claim. His prior experiences with guarantees ("I have seen guarantees before. . . ." Id. ¶ 7) does not provide a justification for ignoring the actual words of this simple document.

For example, in Sterling Nat'l Bank & Tr. Co. of N.Y. v. I.S.A. Merch. Corp., 91 A.D.2d 571 (1st Dep't 1982), the trial court had denied summary judgment based on a guarantor's claim that he did not understand the nature of the document he signed, but the Appellate Division, First Department reversed and granted summary judgment against the guarantor. In doing so, the Court quoted from an opinion of the New York Court of Appeals setting forth New York's strong policy in favor of enforcing agreements over claims of a lack of understanding of their meaning:

> Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material. . . If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him.

Id. at 572 (quoting Pimpinello v. Swift & Co., 253 N.Y. 159, 162-63 (1930).[5] See also Generale Bank, N.Y. Branch v. Nagaraj, 193 A.D.2d 376, 377 (1st Dep't 1993) ("Defendant's subjective belief or understanding regarding the nature of the document he signed does not provide a defense to payment. . . .")

Dilley was not a naïve individual. He is a medical doctor and a principal owner of the Guardhouse Entities and a person who claimed to have a net worth of roughly $18.2 million at the time of the transaction. He is also a person who handed Singh a personal check for

---

[5] As was the case in Sterling Nat'l Bank, no evidence has been presented by Dilley that would place this case in the limited carve-out recognized in Pimpinello: "If the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger, unless the signer be negligent, the writing is void." 253 N.Y. at 163.

over $2.7 million. Under well-settled New York law, his protestations that he did not understand what he was signing does not provide a defense to an action of the Accession Letter.

Dilley fares no better with his claim that Singh "pushed and used high pressure tactics to get his agreement signed." (Id. ¶20.) In the 2020 Opinion, the Court dismissed a nearly identical fraudulent inducement claim by Dilley because he failed to set forth any facts to support his claim:

> Dilley contends that Singh should have told Dilley that the Accession Letter constituted a binding guaranty, and that Dilley merely succumbed to Singh's "high pressure tactics" that induced him to sign the Accession Letter. (Doc 137 ¶¶ 101-103.) Dilley does not provide any detail as to what these alleged "high pressure tactics" entailed, and thus fails to plead fraud with particularity. Nor does Dilley set forth any basis for why Singh had a duty to explain the clear terms of the Accession Letter. See Nat'l Union Fire Ins. Co. of Pittsburgh v. Walton Ins. Ltd., 696 F. Supp 897, 903 (S.D.N.Y. 1988) (defendant did not have duty to explain contents of agreement negotiated at arms' length).

2020 Opinion at 15-16. While Dilley's asserted defense to enforceability does not implicate the particularity requirements, the case is now at the summary judgment stage and he may not rely on a conclusory allegation of unspecified "high pressure tactics" without coming forward with evidence of what was said and done by Singh.

Dilley also makes the baseless claim that the institution of a suit by the Guardhouse Entities against Red Fort was not an event of default under the Loan Agreement. Section 8.1(f) defines an Event of Default to include: "any Borrower . . . shall . . . bring an action to limit its obligations or liabilities thereunder. . . ." The suit brought by the Guardhouse Entities claimed that the Loan Agreement was fraudulently induced and was substantively and procedural

- 11 -

unreasonable.[6]  It sought the remedy of recission or reformation of the Loan Agreement.  Thus, it was an action by the borrowers to limit their obligations and liabilities under the Loan Agreement and therefore an Event of Default.  But even if it were not, the guaranty is "a guaranty of payment" of "the full and prompt payment when due. . . ." and full and prompt payment has not been made by the borrowers.  Loan Agreement § 7.1(a).

Dilley fares no better with his claim that his performance under the guaranty was entirely excused because he learned that Singh had called Dilley's financial institution to inquire if there was enough money to cover both checks delivered to Red Fort in October 2018.  This inquiry, he asserts, justified him in stopping payment on both checks and concluding that Singh had not destroyed the first check as he said he would and viewing Singh's action as an anticipatory breach or repudiation of the agreement. (Dilley Apr. 22, 2021 Decl. ¶¶ 9-17; D. Mem. at 7.)  But Dilley's obligation under the guarantee was unconditional and absolute and not conditioned upon any action or failure to act by Singh.  Loan Agreement § 7.1(a).

Red Fort has more than amply made out its case for judgment in its favor.  In response, Dilley has failed to come forward with admissible evidence which, if believed, would entitle a reasonable fact finder to find in his favor.  Red Fort's summary judgment motion on the guaranty claim will be granted.

B.  Summary Judgment Will Be Denied
    On the Fraud Claim

Red Fort presses its claim for fraud asserting that Dilley misrepresented his assets and those of Iacono.  In support, it has come forward with a screenshot of Dilley's Morgan

---

[6] Guardhouse Productions LLC et al v. Singh et al, Index No. 656185/2018 (Sup Ct, N.Y. County).  The action was removed to this Court. 19 cv 128 (KPF) (Doc 1-1).  The Court takes judicial notice of the allegations and claims in the state court action not for their truth but for the fact that the allegations and claims were made.

Stanley statement provided to Red Fort in advance of the Loan Agreement showing $13,657,002.09 in assets in his Morgan Stanley account for the period ending August 31, 2018. (Singh Feb. 27, 2019 Decl. Ex. 4.) Red Fort since has obtained from Morgan Stanley a true copy of Dilley's account balance as of August 31, 2018 as $2,880.48. (Candido Oct. 10, 2019 Decl. Ex. 4.) The letters and statement were emailed by Dilley to Iacono who, in turn, sent them to Red Fort to induce it to make the loan. One of the accountant's letters represented that Iacono owned certain property in Rome, Italy which she apparently did not and represented Dilley's brokerage account to have in excess of $13 million. As noted, the accountant denies having any role in the preparation of these letters.

Under penalty of perjury, Dilley denies he had "some part in falsifying documents." (Dilley Apr. 22, 2021 Decl. ¶ 18.) He denies that he "used, what [Singh] alleges to be falsified documents to induce him into" the Loan Agreement. (Id. ¶ 19.) He states: "I did not create any false documents. Any document provided was accurate to the best of my knowledge at the time. The Morgan Stanley document provided was complete and accurate at the time [Iacono] turned it over to [the broker on the loan]." (Id. ¶ 21.) But Dilley does absolutely nothing to explain how letters were provided to Red Fort emanating from his accountant which the accountant denies ever having written or authorized. He does not explain how his version of the account statement for August 2018 could show in excess of $13 million in his account and Morgan Stanley's record show less than $3,000 for the same period.

The role of the Court in deciding a summary judgment motion is not to assess the credibility of declarants' statements under penalty of perjury.[7] Dilley's sworn denials are

---

[7] But a Court has ample power to address the actions of those who it believes have committed perjury. See, e.g. Ades v. 57th St. Laser Cosmetica, LLC, 11 cv 8800(KNF), 2013 WL 2449185, at *13 (S.D.N.Y. June 6, 2013)

sufficient to defeat Red Fort's motion for summary judgment on its fraud claim.  At a trial, Red Fort will have the opportunity to prove by a preponderance of evidence that Dilley and Iacono conspired to defraud Red Fort.

    C.    Summary Judgment Will be Denied
           On the Indiana Bad Check Claim

Red Fort seeks summary judgment on its claim under the Indiana Bad Check Statute premised upon Dilley's stopping payment on the check delivered at the Remington, Indiana meeting with Singh.  The statute reads in relevant part as follows:

> Subject to section 8 of this chapter, a person found liable under other applicable law is liable under this chapter to the holder of a check if the person executed and delivered the check to another person drawn on or payable at a financial institution and the person does either of the following: . . . (1) Without valid legal cause stops payment on the check.

Ind. Code § 26-2-7-4.

Dilley raises the threshold issue whether the Indiana statute has any application to his actions given the choice of law provision in the Accession Letter.  The Accession Letter provides that "[t]his Accession Letter and any non-contractual obligations arising out of or in connection with it are governed by the laws of the State of New York."  (Accession Letter ¶ 4.)  The Court considers whether Red Fort's claim is on a non-contractual obligation arising out of or in connection with the Accession Letter.

In the Accession Letter Dilley "agreed to be bound by the terms of the [Loan] Agreement. . . ."  (Accession Letter ¶ 2.)  The Loan Agreement expressly conditioned Red Fort's performance on Dilley's delivery of "a certificated check post-dated to no later than January 15, 2019, in the amount of $2,732,340."  (Loan Agreement §3.1(j).)  Thus, the Court comfortably

---

("[T]he Court finds that it is appropriate to refer [the party's] conduct to the United States Attorney's Office for investigation and, if appropriate, prosecution for perjury.")

concludes that the delivery of the check by Dilley to Singh at the Remington meeting was in connection with the Accession Letter. Because the Indiana Bad Check Statute claim is asserted on a non-contractual obligation—the obligation to refrain from stopping payment on the check—in connection with the Accession Letter, New York law governs by the express terms of the Accession Letter.

Although not raised by either side, the Court considers whether public policy is offended by a federal court sitting in diversity giving effect to a New York choice-of-law provision that would negate the provisions of sister state's protective bad check law. The Court has found no precedent on point, but an analogy may be drawn to a choice-of-law provision that has the effect of negating New York's protective usury laws. In United States v. Moseley, 980 F.3d 9, 22 (2d Cir. 2020), the Second Circuit noted that district courts within the Circuit routinely applied contractual choice of law provisions that negated or lessened the protections of New York's usury laws in commercial transactions. Id. It wrote: "we agree with these decisions that when courts determine whether New York would enforce choice-of-law provisions set out in a contract, corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit." Id. The Court's narrow holding was that "[i]n consumer loan contracts, choice-of-law provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy."

Here, this is not a consumer loan contract or any type of consumer transaction. Dilley was a co-owner of the Guardhouse Entities and in connection with a commercial lending arrangement, he personally guaranteed the loan. New York in this instance would not find it offensive to its public policy to enforce a New York choice-of-law provision that had the effect of negating enforcement of the Indiana Bad Check Statute.

- 15 -

Summary judgment will be denied to Red Fort on its Indiana Bad Check claim.

CONCLUSION

The Court has considered all the arguments of the parties, whether or not they are expressly referenced here. Red Fort's motion for summary judgment against Dilley on its breach of guaranty claim (Count One) is GRANTED and DENIED as to its fraud claim (Count Two) and its Indiana Bad Check Statute claim (Count Six). The Clerk is respectfully directed to terminate the motion (Doc 258).

SO ORDERED.

*P. Kevin Castel*
P. Kevin Castel
United States District Judge

Dated: New York, New York
January 11, 2022